**In re Donald Edward AULT, Wanda Hart Ault, d/b/a Ault Electronics Company, Debtors.**

**DATA GENERAL CORPORATION, Plaintiff,**

**v.**

**C. Kenneth STILL, Trustee, Defendant.**

Bankruptcy No. 1–79–01377.
Adv. No. 1–79–0035.

United States Bankruptcy Court, E. D. Tennessee.

Aug. 15, 1980.

Richard P. Jahn, Jr., Chattanooga, Tenn., for plaintiff.

William M. Foster, Chattanooga, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

The plaintiff in this proceeding, Data General Corporation (DG), is a manufacturer of electronic equipment. It sold three computers to the debtor, Donald Edward Ault (Ault). On the date that Ault filed his petition in bankruptcy two of the computers were in the warehouse of AAA Moving and Storage (Triple A). Shortly thereafter the third computer came into Triple A's possession. This proceeding was begun by Data General's complaint to recover the computers or their proceeds. The defendant is the trustee in bankruptcy. He asserts that he is entitled to the computers or their proceeds as part of the bankruptcy estate or pursuant to his rights as a judgment lien creditor of the debtor. 11 U.S.C. §§ 541 & 544 (1979). The facts are as follows.

## FACTS

The debtor, Donald Edward Ault, was an electronic equipment dealer in Chattanooga,

Tennessee. He did business as sole proprietor of Ault Electronics Company. In May, 1979, he signed an agreement with DG. The agreement is identified as a "System Unit OEM Discount Agreement." It provides generally that the buyer may purchase equipment from DG at a discount if certain conditions are met. When Ault entered into the agreement or soon thereafter, he ordered the three CS/40 computer systems that are the subject of this proceeding. DG accepted the contract on May 15, 1979.

It provides that payment must be made on or before delivery unless the buyer applies for and DG agrees to extend credit. Ault was aware of this term from Jack Isbell (Isbell), DG's sales engineer in East Tennessee. The debtor presented certain financial information to Isbell who forwarded it to DG's headquarters. The information there came into the hands of Brian Cleary, DG's credit manager for this region. He recommended that a 20% down payment in advance be required with the balance due in cash on delivery, i.e., C.O.D. Ault would not agree to such an arrangement. They finally agreed that the computers would be shipped without a down payment, but with the entire purchase price due C.O.D. by certified check. On June 21, 1979 Ault wrote a letter to DG, at its request, as evidence of his agreement to the C.O.D. payment term.

The contract provides that delivery will be made "F.O.B. Point of Origin" and that the time of delivery is the time when the goods are ready for pickup by the carrier. It further provides that absent specific instructions DG will select the carrier, but it will not be DG's agent. The contract also says that title passes on delivery, but DG retains a security interest in the equipment and its proceeds until payment of the purchase price.

The shipping orders for all three computers show that they were ready for shipment before October 1, 1979. They were shipped in three lots, numbers 1, 8, and 9, according to the last digit in DG's shipping orders.

The first shipment included lots 1 and 9. It arrived in Chattanooga on September 21, 1979. Ault was notified of its arrival by Barbara Cotton, an employee of Triple A, the carrier's local agent. He told her to put the computers in storage at Triple A. She testified that it is customary for Triple A to store electronic shipments until the buyer is ready to sell the goods.

Both lots 1 and 9 were shipped under non-negotiable bills of lading. Lot 1 is consigned to Ault Electronics. Lot 9 is mistakenly consigned to Triple A. Both bills of lading include the C.O.D. payment term.

On October 1, 1979, Ault filed a petition in bankruptcy for relief under Chapter 13 of the Bankruptcy Code, 11 U.S.C. (1979). Lots 1 and 9 were still in Triple A's warehouse. On October 5, 1979, lot 8 arrived. It was also covered by a non-negotiable bill of lading which properly named Ault Electronics as consignee. "C.O.D." was not written in the "Method of Payment" blank, but the driver was elsewhere instructed to get a certified check from the buyer-consignee. Barbara Cotton at Triple A and the truck driver were unable to talk to the debtor when Lot 8 arrived, but left a message for him. She called the carrier's dispatcher who approved putting the computer in storage at Triple A. She did not know that the debtor had filed a Chapter 13 case several days earlier.

At some time Jack Isbell learned that Ault's planned sales of two of the computers had fallen through. Isbell then began looking for other purchasers. He planned on arranging any sale he made through Ault so that he would receive his commission even if the buyer was outside his region. Ault was also trying to sell the computers. Both continued their efforts after Ault filed his Chapter 13 case. One computer was sold after the debtor filed his Chapter 13 petition. As to it this dispute concerns only the proceeds of the sale.

Ault testified that one of his planned sales fell through because DG delivered the computer too late. He had expected delivery on June 23, 1979. Ault's orders were made on May 4 and May 10, 1979 and acknowledged by DG on May 25 and 26,

1979. Both Ault and Isbell testified as to how long from the order date it should take for delivery. In any event, one of DG's acknowledgements stated an estimated shipping date of June 23. For DG's purposes the shipping date of equipment is the date that it is made available for shipment.

After filing his Chapter 13 petition, Ault applied to the court to have the computers turned over to him pursuant to § 542 of the Bankruptcy Code, 11 U.S.C. § 542 (1979). DG was given notice of the hearing by registered mail but failed to appear. On November 6, the court ordered that the trustee be given custody, with him to pay the shipping costs and storage charges and subject to further orders of the court.

On November 26, 1979, Ault converted his case from Chapter 13 to a liquidation under Chapter 7. DG then commenced this proceeding by filing the complaint to reclaim the computers or their proceeds.

### CHOICE OF LAW

The contract between Ault and DG provides that it is to be construed under Massachusetts law. The parties have not relied on Massachusetts law. The plaintiff pointed out that in Massachusetts or Tennessee the applicable state law is the Uniform Commercial Code (UCC) and that there are no relevant differences between the two versions of the UCC. The court will therefore apply the UCC as enacted in Tennessee. It is codified in Title 47 of the Tennessee Code Annotated. §§ 47–1–101 - –9–507. For convenience UCC sections will be cited without the title number (47).

### DISCUSSION

■ The question in this proceeding is whether DG has the right as against the trustee in bankruptcy to recover the computers or their proceeds from Triple A. On the date of filing the trustee acquired the rights of a judgment lien creditor of Ault. 11 U.S.C. § 544(a) (1979) (Appendix). As a judgment lien creditor the trustee's rights are superior to the rights of holders of *unperfected* security interests in the debtor's property. 11 U.S.C. § 544(a) (1979); UCC § 9–301(1)(b) (Appendix). Thus, whether the trustee's right to the computers is superior to DG's depends primarily on whether DG had a perfected security interest in the computers.[1]

■ DG asserts that it had perfected security interests under both Articles 2 and 9 of the Uniform Commercial Code. (UCC). Article 2 governs sales of goods. UCC § 2–102. Article 9 governs transactions intended to create a security interest in personal property. UCC § 9–102. Security interests under Article 2 arise by operation of law. Security interests under Article 9 are created by agreement. Compare UCC §§ 2–505 & 2–711(3) and §§ 9–102, 9–201, & 9–203.

The existence of DG's Article 9 security interest was not challenged. The only question as to it is whether it was perfected when Ault filed his petition in bankruptcy.

Nevertheless, the court believes that it is more appropriate to deal with this case first under Article 2. Sections of Article 9 will be referred to when relevant to the construction of Article 2. Sections of Article 7 on bills of lading may be referred to when relevant to the rights of the parties.[2]

DG relies on two sections as giving rise to an Article 2 security interest. First is § 2–505(1)(b).

> Where the seller has identified goods to the contract by or before shipment . . . a non–negotiable bill of lading to himself

---

1. The trustee also relied on § 541 of the Bankruptcy Code. 11 U.S.C. § 541 (1979) (Appendix). Under § 541 Ault's interest in the computers would become part of the estate but that interest would be subject to DG's Article 9 security interest even if unperfected. Section 541 therefore does not help the trustee.

2. Though the computers were shipped across state lines, the parties have not relied on the Federal Bills of Lading Act (FBLA). 49 U.S.C. §§ 81–124 (1976). In any event, there are no great differences between Article 7 and the FBLA as they relate to the facts in this proceeding. J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 21-3 (2d ed. 1980).

or his nominee reserves possession of the goods but except in a case of conditional delivery (subsection (2) of § 2–507) a non–negotiable bill of lading naming the buyer as consignee reserves no security interest even though the seller retains possession of the bill of lading.

From that contorted syntax two rules can be derived:

(1) When a seller ships goods under a straight bill of lading to himself or his nominee, he reserves *possession* of the goods *as security* for the buyer's performance.

(2) When a seller ships goods under a straight bill of lading to the buyer, the seller has a security interest in the goods only if they are conditionally delivered.

It is the second rule that applies here.

DG shipped the goods under straight bills of lading to the buyer, Ault, except for one bill that mistakenly named Triple A as consignee. The court will for the moment ignore that bill of lading.

In order to have a security interest DG must also have made a "conditional delivery." Section 2–507(2) defines delivery on condition:

Where payment is due and demanded on the delivery to the buyer of goods or documents of title, his right as against the seller to retain or dispose of them is conditional upon his making the payment due.

DG argues that the C.O.D. requirement made the delivery conditional under § 2–507(2).

The trustee's attack on DG's claimed Article 2 security interest is based on the conditional delivery requirement. First he argues that under the contract payment was due after delivery. That is a technical argument based on the meaning of delivery. The trustee's second argument goes to the heart of the matter–whether Ault or DG had possession of the computers when the trustee's rights attached. That argument, however, is couched in terms of waiver of the conditional delivery–meaning in this instance not waiver of the contractual provision but surrender of possession. See UCC § 2-507 Comment 3 (Appendix).

## CONDITIONAL DELIVERY

The trustee first argues that DG did not make a conditional delivery because payment was not due when the computers were shipped.

DG's contract provided that the time of delivery was when the computers were ready for pick–up by the carrier and that payment was due on or before delivery, unless otherwise agreed. If the contract's time of delivery term is controlling, then the trustee's argument has merit. Payment under the C.O.D. term was not due at the time of delivery as stated in the contract.

The parties to a sale may agree to a time when delivery is to be made. Such an agreement is controlling and cannot be varied by parol evidence. 67 Am.Jur.2d, Sales § 171 (1973). The time of delivery term in DG's contract with Ault did not provide when delivery was to be made. It merely defined the time of delivery for the purpose of determining who bore the risk of loss, when title passed, and when payment was due. It did not necessarily define the meaning of delivery in § 2–507(2).

The provisions on the time of delivery and DG's obligation to ship made the contract essentially what the UCC calls a shipment contract. UCC § 2–503, Comment 5 (Appendix). In shipment contracts delivery is said to occur when the goods are delivered to the carrier. 67 Am.Jur.2d, Sales § 337 (1973). Under the rule that payment of the price and tender of delivery are concurrent conditions, it appears that payment would be due when the goods are shipped unless the parties agree otherwise. But that is not the rule that developed.

When goods are shipped to a buyer in conformity with a contract . . . , delivery to the carrier is said to be delivery to the buyer. The principles laid down in the last section, if subject to no qualification, might seem to involve the conclusion that as soon as the goods have been shipped the seller is entitled to claim the price though the goods have not yet

arrived. Here, however, another principle must be taken into consideration. The buyer is entitled to inspect the goods before he is deemed to have accepted them; and certainly by the great weight of authority inspection may be made at the place of destination. Accordingly, where goods are sent forward in conformity with an order or contract and no time is expressly fixed for paying the price the obligation to pay it does not mature concurrently with delivery of the goods to the carrier, but only when the buyer has had an opportunity to inspect them, unless the terms of the contract preclude inspection. Were the rule otherwise contracts to pay the price against the bill of lading or to pay for goods C.O.D. instead of being favorable to the seller would be beneficial to the buyer, who would otherwise be liable for the price as soon as the goods were shipped.

2 Williston on Sales § 448a at 670–671 (Rev'd ed. 1948).

It follows that since, under a contract for the sale of goods to be shipped by the seller it is clear from universal practice that shipment must be made without tender of the price, unless *payment in advance* was bargained for, this duty of the seller to ship the goods necessarily shows that the parties did not intend concurrent conditions between the payment of the price and the delivery to the carrier.

2 Williston on Sales § 448b at 673 (Rev'd ed. 1948).

■ The UCC has continued the rule that in shipment contracts, unless otherwise agreed, payment is due when the goods arrive rather than when they are shipped. UCC § 2–310(a) (Appendix); J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 3–5 at 110 (2d ed. 1980).[3] See also § 2–513(1). The court thinks that payment on delivery under § 2–507(2) must be interpreted in light of

this rule to mean that payment is due on delivery under a shipment contract if it is due when the goods arrive.[4] See also UCC § 2–503, Comment 2 (Appendix). C.O.D. means "collect on delivery" and obligates the carrier to collect the price before surrendering the goods to the buyer. *Kremer v. Southern Express Company*, 46 Tenn. 356 (1869); 67 Am.Jur.2d, Sales § 346 (1973). The C.O.D. requirement made payment due when the goods arrived, when payment is normally due under a shipment contract if the parties do not agree otherwise. Thus the contract between DG and Ault provided for payment on delivery within the meaning of § 2–507(2).

The trustee's argument is that payment on delivery means what is usually thought of as payment in advance, which is also what the contract provided for until modified by the C.O.D. agreement.

## WAIVER OF CONDITION–LOSS OF POSSESSION

■ Article 2 security interests depend on "possession" of the goods for their existence and perfection. UCC § 2–505 & 2–711(3) (Above & Appendix).

Section 9–113 of the UCC makes that clear:

A security interest arising solely under the Article on Sales . . . is subject to the provisions of this Article except . . . to the extent . . . and so long as the debtor does not have or does not lawfully obtain possession of the goods

(a) no security agreement is necessary to make the security interest enforceable; and

(b) no filing is required to perfect the security interest; and

(c) the rights of the secured party on default are governed by the Article on Sales.

---

**3.** Under a C.O.D. term the buyer may lose his right to inspect before payment. UCC § 2–513(3). But payment is still due on arrival of the goods. UCC § 2–310 (Appendix).

**4.** The trustee's argument is inconsistent with § 2–505 which provides that the security interest may arise when goods are identified to the contract *by shipment.*

It should be apparent from subsections (a) and (b) that when the seller loses possession of the goods the Article 2 security interest not only becomes unperfected but essentially ceases to exist. See also UCC § 9–203(1) (Appendix).

■ Possession, of course, does not require physical possession of the goods. Possession generally includes the right to control goods in the physical possession of another. J. White & R. Summers, Handbook of the Law under the Uniform Commercial Code § 23–10 at 935–936 (2d ed. 1980) (discussing perfection by possession under Article 9).

■ Possession is also significant as a means of giving notice of rights in the goods, since notice is the basis of perfection of security interests. And possession must be measured in part by its ability to give notice.

The trustee's argument is that when the computers were shipped, or at the latest, when they arrived and were stored by Triple A, Ault obtained possession. The argument has some merit based on the wording of the statutes but, in the court's opinion, ignores the practical effect of shipping goods C.O.D.

■ It is usually said that a C.O.D. term obligates the carrier to collect the price before surrendering the goods to the buyer. 67 Am.Jur.2d, Sales § 346 (1973). From the seller's point of view it means that the carrier is to retain physical possession of the goods until the buyer tenders payment in cash or as otherwise agreed. Indeed, if the carrier surrenders possession without collecting the price, then it is liable to the seller, unless the seller agreed to the surrender or the carrier acted pursuant to a court order. Annot., 27 ALR3d 1320 (1969). The obvious purpose of a C.O.D. requirement is to protect the seller by denying the buyer physical possession or control of the goods until tender of the price. 2 Williston on Sales § 448a (above); UCC § 2–705, Comment 1 (Appendix).

■ Triple A's storage of the computers was not a surrender of possession to Ault. Under a C.O.D. term the carrier may hold the goods in its warehouse for a reasonable time to allow the consignee to pay if he was not able to pay when the goods arrived. 13 Am.Jur.2d, Carriers § 456 (1964). According to the testimony of Barbara Cotton, that in essence is what happened and is a common practice in the carriage of electronic goods. The C.O.D. requirement was part of Triple A's contract with DG. 13 Am.Jur.2d Carriers § 454 (1964). DG could have directed Triple A to surrender the computers without payment. But if Triple A had surrendered the computers to Ault without DG's consent and without payment, it would have been liable to DG. 13 Am.Jur.2d, Carriers § 457 (1964); Annot., 27 ALR3d 1320, § 3 (1969). There was no proof that DG directed Triple A to surrender the goods without payment. At all times Triple A held the computers subject to the requirement that Ault pay before he could get them from the warehouse.

The straight bills of lading to Ault did not give him the right to take the computers from Triple A without paying. They indicated that delivery was to be made to him, and they were evidence of his title to the goods; but his rights under them were subject to the C.O.D. requirement that was a part of both his contract with DG and the carrier's contract with DG.

The actions of Ault and Isbell in trying to re–sell and re–ship the computers did not give Ault control of them. Isbell wanted the sale to be through Ault so that he would receive a commission. The trustee apparently assumes that Triple A would have reshipped the computers solely at Ault's direction. It is not clear that it would have done so or that if it had, it would have been free from possible liability to DG if DG was not paid. UCC § 7–303 (Appendix). It is not even clear whether a re–shipment could have been free of the C.O.D. requirement. It appears to the court, however, that the C.O.D. term should give the seller the right to direct disposition of the goods in the carrier's possession, without regard to what directions the buyer might give the carrier. If Triple A was

willing to act on another assumption, the court suggests that it would have acted at its peril if DG had not been paid.

 The trustee also relies on the provision in DG's contract with Ault which says that the carrier is not DG's agent. Generally, in shipment contracts the carrier is the buyer's agent for accepting delivery. 67 Am.Jur.2d, Sales § 337 (1973). But a person may be an agent for two parties at the same time. The C.O.D. requirement effectively made Triple A the agent of DG to collect the price and to retain possession until collection of the price.

> The practice is common in the United States of sending goods to the buyer marked "c.o.d." The meaning of these letters is "collect on delivery." The object of so marking goods is to instruct the carrier not to deliver the goods until the price has been collected. It has been held by some authorities that the effect of this is to retain the property in the seller until the price has been paid. The overwhelming weight of authority, however, now supports the view that possession only is to be retained on behalf of the seller until the price is paid and that the property passes immediately on delivery to the carrier . . . .

2 Williston on Sales § 279 at 85 (Rev'd ed. 1948).

> It has been the general rule that where goods were shipped by common carrier c.o.d. to one who ordered them from the shipper, title vested in the buyer at the place and time of delivery to the carrier . . . . This was on the theory that the carrier was the agent of the seller merely to collect the price. In such case, the seller merely had lien on the property for the price and the right to possession until it was paid . . . .

67 Am.Jur.2d, Sales § 346 at 489 (1973).

The trustee further relies on other provisions of Article 2 as showing that DG lost possession. Most significant are parts of § 2–403, in particular subsections (2) and (3).

(2) Any entrusting of possession of goods to a merchant who deals in goods of that kind gives him power to transfer all rights of the entruster to a buyer in ordinary course of business.

(3) "Entrusting" includes any delivery and acquiescence in retention of possession regardless of any condition expressed between the parties to the delivery or acquiescence in possession and regardless of whether the procurement of the entrusting or the purchaser's disposition of the goods have been such as to be larcenous under the criminal law.

The trustee argues that DG entrusted the computers to Ault within the meaning of § 2–403, and therefore the computers were not in DG's possession within the meaning of § 2–505(1)(b).

In support, the trustee can point to Comment 4 to § 2–505.

> In the case of a shipment by non–negotiable bill of lading taken to a buyer, the seller, under subsection (1) retains no security interest or possession as against the buyer and by shipment he *de facto* loses control as against the carrier except where he rightfully and effectively stops delivery in transit. In cases in which the contract gives the seller the right to payment against delivery, the seller, by making an immediate demand for payment, can show that his delivery is conditional, but this does not prevent the buyer's power to transfer full title to a sub–buyer in ordinary course or other purchaser under Section 2–403.

 The trustee's argument is that "entrusting" under § 2–403 and possession for the purpose of perfecting an Article 2 security interest are mutually exclusive. Even taking that view, the court thinks that the trustee must lose. The court stands by its earlier conclusion that DG had not lost possession of the computers. Construing "entrusting of possession" consistently thus requires court to hold that the computers were not entrusted to Ault.[5]

---

**5.** See generally Dolan, *The Uniform Commercial Code and the Concept of Possession in the Marketing and Financing of Goods*, 56 Tex.L. Rev. 1147, 1173-1177 (1978).

Though entrusting is defined to include any delivery, the variable meaning of delivery must be taken into account. For example, if DG had used a straight bill of lading to itself then it would have had possession *by definition*, despite its technical delivery. UCC § 2–505(1)(b) (above).

The trustee finally argues that DG lost possession of the computers pursuant to an earlier order by this court. After notice to DG and a hearing at which it failed to appear, the court gave the trustee control of the computers. The trustee has argued that the court's order gave him possession. The order specifically left a determination of DG's rights for subsequent proceedings. Furthermore, the trustee's rights as a judgment lien creditor under § 544(a) should be determined as of the commencement of the bankruptcy case. That was the rule under § 544(a)'s predecessor, § 70c of the Bankruptcy Act, 11 U.S.C. § 110 (1976). 4B Collier on Bankruptcy ¶ 70.51 (14th ed. 1967). The trustee's argument is meritless.

The trustee next argues that in any event DG had only ten days after their arrival within which to reclaim the computers. This ten day limit is derived from Comment 3 to § 2–507 (Appendix). It has been imposed on the right to reclaim under § 2–507(2). *In re Helms Veneer Corp.*, 287 F.Supp. 840, 5 U.C.C.Rep.Serv. 977 (W.D. Va.1968).

That does not help the trustee. The right to reclaim under § 2–507(2) and DG's claimed security interest under § 2–505(1)(b) are not the same thing. Section 2–507(2) provides a definition for determining whether the security interest exists. But the right to reclaim under § 2–507(2) exists without regard to whether there is a security interest. It is a right meant to exist even after the buyer has absolute possession of the goods. On the other hand, the security interest is dependent on possession and the making of a conditional delivery. So long as the conditions exist on which the security interest depends, the seller has whatever rights flow from the security interest, not merely the right to reclaim under § 2–507(2). See generally Dolan, *The Uniform Commercial Code and the Concept of Possession in the Marketing and Financing of Goods*, 56 Tex.L.Rev. 1147, 1173–1177 (1978).

The court concludes that DG had possession of the computers and so under § 2–505(1)(b) had a perfected security interest. There is only one problem of interpretation remaining.

The seller with an Article 2 security interest has only the remedies provided by Article 2. UCC § 9–113(c) (above). It is not clear that Article 2 provides any remedy for DG. If the right to reclaim inferred from § 2–507(2) is its remedy, then, by circuitous reasoning, there is the issue of the implied ten day limit. The parties have not much argued the remedy question. The court notes that a C.O.D. provision should have practically the same effect as an order to stop delivery of goods in transit. UCC § 2–705, Comment 1 (Appendix). In any event, a seller in possession when the buyer breaches the contract can rely on the goods for its recovery. UCC § 2–703 & 2–706 (Appendix). Accordingly DG is entitled to the computers or their proceeds.

## MISCELLANEOUS PROBLEMS

One of the bills of lading mistakenly named Triple A as consignee. The court does not think that the trustee's rights are any greater because of the mistake. The carrier was Ault's agent to accept delivery. But consignment to Ault's agent would put the trustee in a better position only if Ault thereby gained greater control over the computer. He did not. The consignment to Triple A, if anything, reduced Ault's rights in the computer. UCC § 7–403(1) & (4) (Appendix). Third parties would be more likely to doubt Ault's rights in a computer not consigned to him. Furthermore, the C.O.D. provision made Triple A also DG's agent to retain possession. The consignment to Triple A can be viewed as a consignment to DG's agent for possession.

Another of the computers was delivered after Ault's filing. That likewise does not increase the trustee's rights as

against DG. As the court pointed out before, the rights of the trustee as a judgment lien creditor are generally determined as of the date of filing. On that date the computer was apparently still in transit, and DG had whatever rights of stoppage in transit are provided by Article 2. On the other hand, even if the trustee's lien rights are deemed to have attached later, DG would still prevail in accordance with the court's decision as to its Article 2 security interest and its decision hereafter as to its Article 9 security interest.

## THE ARTICLE 9 SECURITY INTEREST

Article 9 is specific as to what was required for DG to perfect its Article 9 security interest.

Section 9–304(3) provides:

A security interest in goods in the possession of a bailee other than one who has issued a negotiable document therefor is perfected by issuance of a document in the name of the secured party or by the bailee's receipt of notification of the secured party's interest or by filing as to the goods.

DG's security interest was not perfected by filing or by issuance of straight bills of lading to itself.

That leaves one method of perfection—notice to the bailee of the secured party's interest. The court notes that when notice is given in a situation like this the secured party is deemed to have *possession* of the goods. Section 9–305 provides:

A security interest in . . . goods . . . may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest.

 There was no proof that DG notified Triple A specifically that it had a "security interest" in the computers. The question is whether the C.O.D. requirement in effect was notice of the secured party's interest.

A strict reading of §§ 9–304(3) and 9–305 would require that the bailee receive notice of the secured party's rights as a secured party, rather than other rights, such as the rights of a seller pursuant to a C.O.D. term.

The definitions of notice or notification and of receipt of notice or notification are too general to answer the question. UCC §§ 1–201(25) & (26) (Appendix). Likewise, the Comments to §§ 9–304 and 9–305 are not enlightening.

 Construing §§ 9–304(3) and 9–305 too strictly could cause unjust results. Under Article 9 the parties may create a security interest without ever using those words. A creditor may be a secured party without thinking of himself as such. What is required is notification of the secured party's "rights" in the collateral. Security interest is defined in § 1–201(37).

"Security interest" means an interest in personal property or fixtures which secures payment or performance of an obligation.

Obviously, Triple A knew that it was to retain possession of the computers to secure payment by Ault. The court thinks that Triple A had notice of the secured party's rights. DG's Article 9 security interest was therefore perfected by Triple A's possession with notice of DG's rights. See *In re Miller*, 545 F.2d 916, 20 U.C.C.Rep.Serv. 1314 (5th Cir. 1977); *In re Automated Bookbinding Services, Inc.*, 471 F.2d 546, 11 U.C.C. Rep.Serv. 897 (4th Cir. 1972) *rev'g* 336 F.Supp. 1128 (D.Md.1972).

## DATE OF DELIVERY

There was proof at the trial that Ault expected the first delivery to be earlier than it was and that he may have lost one sale because of the delivery later than expected. The trustee did not, however, file a counterclaim for damages based on breach of contract because of the later delivery. In light of the court's decision above, no ruling on the late delivery question is necessary.

## SUMMARY

The court holds that DG has perfected security interests under both Article 2 and 9 of the UCC. It is therefore entitled to possession of the computers or their proceeds. An order will be entered accordingly.

This memorandum constitutes findings of fact and conclusions of law. Rule 752, Bankruptcy Rules.

## APPENDIX

11 U.S.C. § 544(a) (1979).

(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution returned unsatisfied at such time, whether or not such a creditor exists;

. . . . .

11 U.S.C. § 541(a) (1979).

(a) The commencement of a case . . creates an estate. Such estate is comprised of all the following property, wherever located:

(1) Except as provided in subsections (b) and (c)(2) of this section, all legal and equitable interests of the debtor in property as of the commencement of the case.

UCC § 1–201(25) & (26)

(25) A person has "notice" of a fact when

(a) he has actual knowledge of it; or

(b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

. . . . .

(26) A person "notifies" or "gives" a notice or notification to another by taking such steps as may be reasonably required to inform the other in ordinary course whether or not such other actually comes to know of it. . . .

UCC § 2–310

Unless otherwise agreed:

(a) payment is due at the time and place at which the buyer is to receive the goods even though the place of shipment is the place of delivery; and

(b) if the seller is authorized to send the goods he may ship them under reservation, and may tender the documents of title, but the buyer may inspect the goods after their arrival before payment is due unless such inspection is inconsistent with the terms of the contract (§ 2–513); and

UCC § 2–503 Comment 2

2. . . .

In cases in which payment is due and demanded upon delivery the "buyer's disposition" is qualified by the seller's rights to retain control of the goods until payment by the provision of this Article on delivery on condition. However, where the seller is demanding payment on delivery he must first allow the buyer to inspect the goods in order to avoid impairing his tender unless the contract for sale is on C.I.F., C.O.D., cash against documents or similar terms negating the privilege of inspection before payment.

. . . . .

UCC § 2–503, Comment 5

5. . . . [U]nder this Article the "shipment" contract is regarded as the normal one and the "destination" contract as the variant type. The seller is not obligated to deliver at a named destination and bear the concurrent risk of loss until arrival, unless he has specifically agreed so to deliver or the commercial understanding of the terms used by the parties contemplates such delivery.

UCC § 2–507, Comment 3

3. Subsection (2) deals with the effect of a conditional delivery by the seller and in such a situation makes the buyer's "right as against the seller" conditional upon payment. These words are used as words of limitation to conform with the policy set forth in the bona fide purchase sections of this Article. Should the seller after making such a conditional delivery fail to follow up his rights, the condition is waived. The provision of this Article for a ten day limit within which the seller may reclaim goods delivered on credit to an insolvent buyer is also applicable here.

UCC § 2–703

Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery . . . then with respect to any goods directly affected and, if the breach is of the whole contract . . ., then also with respect to the whole undelivered balance, the aggrieved seller may

(a) withhold delivery of such goods;

(b) stop delivery by any bailee as hereafter provided . . .;

. . . . .

UCC § 2–705, Comment 1

1. Subsection (1) applies the stoppage principle to other bailees as well as carriers.

It also expands the remedy to cover the situations, in addition to buyer's insolvency, specified in the subsection. But since stoppage is a burden in any case to carriers, and might be a very heavy burden to them if it covered all small shipments in all these situations, the right to stop for reasons other than insolvency is limited to carload, truckload, planeload or larger shipments. The seller shipping to a buyer of doubtful credit can protect himself by shipping C.O.D.

UCC § 2–706(1)

(1) Under the conditions stated in § 2–703 on seller's remedies, the seller may resell the goods concerned or the undelivered balance thereof. . . .

UCC § 2–711(3)

(3) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller.

UCC § 7–303(1)

(1) Unless the bill of lading otherwise provides, the carrier may deliver the goods to a person or destination other than that stated in the bill or may otherwise dispose of the goods on instructions from:

. . . . .

(b) the consignor on a non–negotiable bill notwithstanding contrary instructions from the consignee; or

(c) the consignee on a non–negotiable bill in the absence of contrary instructions from the consignor, if the goods have arrived at the billed destination or if the consignee is in possession of the bill; or

(d) the consignee on a non–negotiable bill if he is entitled as against the consignor to dispose of them.

UCC § 7–403(1) & (4)

(1) The bailee must deliver the goods to a person entitled under the document who complies with subsections (2) and (3), unless and to the extent that the bailee establishes any of the following:

(a) delivery of the goods to a person whose receipt was rightful as against the claimant;

. . . . .

(d) the exercise by a seller of his right to stop delivery pursuant to the provisions of the Article on Sales . . .;

(e) a diversion, reconsignment or other disposition pursuant to the provisions of this Article . . .;

. . . . .

(g) any other lawful excuse.

. . . . .

(4) "Person entitled under the document" means holder in the case of a negotiable

document, or the person to whom delivery is to be made by the terms of or pursuant to written instructions under a non–negotiable document.

UCC § 9–203(1)

(1) Subject to the provisions of . . . § 9–113 on a security interest arising under the Article on Sales, a security interest is not enforceable *against the debtor* or third parties unless

 (a) the collateral is in the possession of the secured party; or

 (b) the debtor has signed a security agreement . . . . .

. . . . .

UCC § 9–301(1)(b).

(1) Except as otherwise provided in subsection (2), an unperfected security interest is subordinate to the rights of

. . . . .

 (b) A person who becomes a lien creditor without knowledge of the security interest and before it is perfected;