In re The **JULIEN COMPANY,** Debtor.

Jack F. **MARLOW,** Trustee, Plaintiff,

v.

**ROLLINS COTTON COMPANY, A DIVISION OF LOR, INC.,** Defendant/Third Party Plaintiff,

v.

BANKERS TRUST COMPANY and L & S Cotton Systems, Inc., Third Party Defendants.

Bankruptcy No. 90–20283–B (jmn). Adv. No. 90–0104.

United States Bankruptcy Court, W.D. Tennessee, Western Division.

May 6, 1994.

J. David Blaylock, Nan Barlow, Udelsohn, Blaylock & Marlow, P.C., Memphis, TN, for Jack Marlow, Trustee.

William J. Landers, Lee L. Piovarcy, Robert E. Orians, Martin, Tate, Morrow & Marston, P.C., Memphis, TN (Richard A. Rosen, Edward S. Zas, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, of counsel), for Bankers Trust Co.

John R. Dunlap, Thomas H. Fulton, Humphreys, Dunlap, Wellford, Acuff & Stanton, P.C., Memphis, TN, Allen I. Hirsch, Jerome L. Kaplan, Arnall, Golden & Gregory, Atlanta, GA, for Rollins Cotton Co.

Saul C. Belz, Waring Cox, Memphis, TN, for L & S Cotton Systems, Inc.

## MEMORANDUM OPINION ON TRUSTEE'S COMPLAINT TO AVOID PREFERENTIAL TRANSFERS

WILLIAM HOUSTON BROWN,
Bankruptcy Judge.

In this adversary proceeding, the Chapter 11 Trustee seeks to avoid as preferential transfers payments made by The Julien Company ("debtor") to the defendant Rollins Cotton Company ("Rollins") in the amount of $22,028,569.52. Rollins answered and filed a third party complaint against Bankers Trust Company ("BTCo") and L & S Cotton Systems, Inc. ("L & S"). In the third party complaint, Rollins seeks judgment against BTCo and L & S to the extent Rollins is found liable to the Trustee. Rollins also sought punitive damages against the third party defendants. L & S and BTCo have answered the third party complaint denying any liability to Rollins.

The Court had earlier entered summary judgment for Rollins. *Marlow v. Rollins Cotton Co., et al. (In re The Julien Co.)*, 127 B.R. 604 (Bankr.W.D.Tenn.1991). However, upon appeal the United States District Court found the existence of genuine issues of material fact and remanded the proceeding for a trial on the merits. *In re The Julien Co.,* Unpub. Order No. 91–2731–M (D.W.D.Tenn. Aug. 6, 1992). Subsequently, after Rollins' appeal to the Court of Appeals for the Sixth Circuit, discovery was completed and a second motion for summary judgment was filed by BTCo. That motion was denied by an order dated November 2, 1993, and the proceeding was set for trial beginning on December 6, 1993. At trial, no live testimony was offered. Rather, the parties entered into extensive stipulations and submitted the issues between the Trustee and Rollins upon the stipulations, affidavits, depositions, and documents. Memoranda and proposed findings and conclusions have been submitted and final oral arguments were heard on March 24, 1994. As a result of this memorandum opinion, an order will be entered in favor of Rollins and against the Trustee.

### SYNOPSIS OF TRANSACTIONS

The transactions at issue were complex but, for purposes of an introduction to the pertinent legal issues, may be summarized as follows: Rollins was the owner and possessor of certain certificated cotton, some of which was sold to the debtor. Rollins was paid for these sales. The debtor in turn sold the certificated cotton to third parties. Subsequently, Rollins agreed with the debtor to what became a financing arrangement, under which Rollins paid for the repurchase of some of the certificated cotton as Rollins received the warehouse receipts, and Rollins held these certificated cotton warehouse receipts while the debtor marketed the cotton for other sales. At this stage, Rollins was a secured creditor, having advanced funds to or for the debtor for the repurchases, and Rollins held a possessory security interest pursuant to oral agreement with the debtor. At that point, the debtor also had a financing arrangement with BTCo, under which a line of credit was established and BTCo held other cotton collateral, including uncertificated cotton warehouse receipts, through its subdepository L & S. The debtor determined that it needed the certificated cotton warehouse receipts, held by Rollins, for the purpose of pursuing with a department of the federal government a decertification and recertification process. In an attempt to re-

main a secured creditor, Rollins agreed to relinquish its possession of the certificated cotton warehouse receipts before being paid but conditioned upon receiving substitute collateral in the form of uncertificated cotton warehouse receipts being held by L & S. The debtor obtained the certificated cotton warehouse receipts, and L & S signed two trust receipts and simultaneously blocked the required number of uncertificated cotton warehouse receipts. Rollins asserts that this blocking preserved its security, as it amounted to acknowledgement of possession by the bailee L & S. Subsequently, the debtor paid Rollins its debt of $22,028,569.52 and L & S released its collateral block. The Trustee sued Rollins for avoidance of the $22,028,596.52 transfers as being preferential.

### *SECTION 547(b)(5)*

Rollins' defense to the complaint rests upon its assertions that Rollins was a fully secured creditor at all times relevant to this proceeding and, as a result, that the Trustee would be unable to satisfy one of the elements of a preference cause of action, specifically 11 U.S.C. § 547(b)(5). In order to establish a preference, § 547(g) mandates that the Trustee has the burden of proof to establish all elements under § 547(b), which provides:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
>> (1) to or for the benefit of a creditor;
>>
>> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
>>
>> (3) made while the debtor was insolvent;
>>
>> (4) made—
>>
>>> (A) on or within 90 days before the date of the filing of the petition; or
>>>
>>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>>
>> (5) that enables such creditor to receive more than such creditor would receive if—

>>> (A) the case were a case under chapter 7 of this title;
>>>
>>> (B) the transfer had not been made; and
>>>
>>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Section 547(c) provides for defenses to a preference avoidance, if the Trustee proves all elements under § 547(b); however, those defenses are not determinative issues in this proceeding, as the Trustee has failed to satisfy § 547(b)(5).

### *ISSUES FOR TRIAL*

This is a cotton warehouse receipt and Uniform Commercial Code ("UCC") security interest dispute. After a pretrial conference it was determined that the issues for trial in December, 1993, were:

1. Whether the elements of 11 U.S.C. § 547(b) are established by the Trustee's proof: The only disputed preference element is § 547(b)(5).

2. Whether Rollins maintained a perfected security interest in certain uncertificated cotton warehouse receipts: This issue includes sub-issues of whether Rollins' prior security interest attached to those receipts, whether a substitution of collateral occurred, and whether those receipts constituted proceeds of Rollins' original collateral. More specifically, UCC issues of attachment and perfection are of paramount concern.

3. Whether the statutory exceptions, or defenses, of 11 U.S.C. § 547(c)(1) or (2) are established by Rollins proof: However, these issues were subsequently modified by stipulation number 10.

Specifically reserved for later trial, if necessary, were the third party complaint and the Trustee's asserted issues of whether pre-existing, perfected security interests were held by other lenders in the uncertificated cotton warehouse receipts or whether a priority dispute among secured creditors exists. It was agreed by the parties that only if Rollins loses in this first trial or if it is concluded that Rollins has a first lien on the uncertificated warehouse receipts as proceeds of its original collateral will this trial,

after finality of a resulting judgment, be the last one in this proceeding. Otherwise, the bifurcated issues either must be settled, tried, or disposed of by appropriate motions.[1]

Notwithstanding the bifurcation of the third party complaint, the Court permitted BTCo to participate in this phase of the adversary proceeding. Not surprisingly, BTCo and the Trustee adopted the same position on the issues. Assuming that the Trustee's recovery would go to unsecured creditors, the confirmed plan in this case reveals that BTCo is the largest unsecured creditor.

### *STIPULATIONS*

The parties stipulated to the following conclusions and facts; however, as to a few stipulations, the Trustee and BTCo reserved an objection as to relevancy to the determination of the issues submitted for trial. The Court has determined that each of the factual stipulations has some relevancy to the understanding of the issues before the Court. While the Court is not bound by the parties' stipulations of conclusions of law, the Court agrees with and accepts those stipulations.

1. Rollins Cotton Company ("Rollins") is a cotton merchant located in Montgomery, Alabama. Rollins is a division of LOR, Inc., a Georgia corporation.

2. The founders of Rollins previously had eighteen years experience as cotton buyers.

3. The Julien Company ("debtor") was a cotton merchant prior to the bankruptcy filing.

4. Jack F. Marlow, the plaintiff, is the duly appointed Chapter 11 Trustee for the debtor.

5. This adversary proceeding is one arising in the Chapter 11 case of the debtor now pending in this Court.

6. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157 and 11 U.S.C. § 547. This is a core proceeding under 28 U.S.C. § 157(b)(2)(F).

7. The parties consent to this Court's hearing and finally determining this adversary proceeding.

8. All elements of 11 U.S.C. § 547(b) shall be taken as having been proven except for 11 U.S.C. § 547(b)(5).

9. Rollins does not contest, and the Trustee may rely upon, the statutory presumption of insolvency contained in 11 U.S.C. § 547(f).

10. Rollins is no longer asserting either 11 U.S.C. § 547(c)(1) or (c)(2) as a defense to this action, except to the extent that Rollins' contention that it has a fully attached and perfected first security interest in the 68,640 uncertificated warehouse receipts (as defined below) might fall within one of those defenses.

11. All elements of 11 U.S.C. § 547(b) shall be taken as having been proven if the Court determines that Rollins was unsecured at the time of the payments by the debtor to Rollins on or about October 24, 1989, and October 26, 1989.

12. This Chapter 11 case was commenced on January 10, 1990, by the filing of an involuntary petition.

13. Rollins engaged in buying cotton from farmers and selling it to mills. It is common in the cotton trade for cotton to be bought and sold by oral contract. In fact, oral contracts for the purchase and sale of cotton are common in the industry.

14. Cotton futures contracts are contracts to buy or sell cotton for future delivery. Trading of futures contracts is carried out in cotton exchanges such as the New York Cot-

---

1. This Court has difficulty understanding the continuing need for the Trustee's involvement in a priority dispute, if one exists between creditors, now that the Trustee's avoidance action has failed. It should be noted that the Trustee did not bring this avoidance action under 11 U.S.C. § 544(a), under which "the trustee gets all the rights under state law of a hypothetical creditor with a lien on all property of the debtor." 2 JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM

COMMERCIAL CODE, § 25–3 at 4–19 (1988). Also, the amended complaint pleads only for avoidance of preferential transfers and not otherwise for determination of the extent, priority or validity of liens. The need for any further litigation between these parties will await the finality of the order resulting from this opinion and the ruling on any further dispositive motions to be filed that are related to the bifurcated issues.

ton Exchange, which is a recognized source for the market price for cotton futures.

15. The United States Department of Agriculture publishes the *Daily Spot Cotton Quotations* which contains market quotations which are relied upon by the cotton trade.

16. In May, 1989, Rollins purchased certain certificated cotton, which is cotton that has been classed by the government as being tenderable on the New York futures market. More specifically, certificated cotton has been submitted to a delivery point where, under government supervision, it is analyzed to determine if it falls within the narrow range of grade, staple, and micronaire acceptable for delivery on New York Cotton Exchange futures contracts. Only certificated cotton may be delivered on a New York Cotton Exchange futures contract.

17. Over several days, Rollins purchased May futures contracts under which Rollins eventually took delivery of warehouse receipts for 189,401 bales of cotton.

18. Rollins sold some of these bales to Cargill, Inc. and some to the debtor. In early June, 1989, the debtor contacted Rollins concerning the possible purchase of an additional 92,929 bales of certificated cotton from Rollins.

19. Rollins decided to sell to the debtor, in part because Rollins was accruing carrying charges since May, 1989. If Rollins had not sold the cotton to someone and had retendered the cotton on the July New York futures contracts, Rollins would have sustained a loss.

20. The debtor agreed to purchase the 92,929 bales for deferred delivery and at a price which would permit Rollins to break even on its original purchase. Until payment was received by Rollins, Rollins was to retain possession of the certificated warehouse receipts. Rollins could also continue to attempt to market the cotton at a profit prior to delivery to the debtor.

21. Rollins and the debtor arranged for delivery of 79,044 bales to two purchasers, and Rollins invoiced the debtor for these bales on July 3 and 18, 1989.

22. Rollins received payment of its invoices on July 5 and 18, 1989.

23. 13,885 bales of certificated cotton were delivered and sold to the debtor, which sale was invoiced on August 24, 1989. Payment was made to Rollins on August 28, 1989.

24. A summary of these transactions is as follows:

| EX. NO. | DATE OF INVOICE | NUMBER OF BALES | AMOUNT | DATE OF PAYMENT |
|---|---|---|---|---|
| 1 | 7/3/89 | 34,818 | $12,072,646.43 | 7/5/89 |
| 2 | 7/3/89 | 43,731 | $15,271,066.76 | 7/5/89 |
| 3 | 7/18/89 | 495 | $ 170,767.37 | 7/18/89 |
| 4 | 8/24/89 | 13,885 | $ 4,654,647.51 | 8/28/89 |

*None of these transfers is the subject of the Trustee's complaint.*

25. The debtor, through Julien Hohenberg, and Rollins, through Stuart Frazer, had previously negotiated what became an agreement that certificated cotton, which Rollins had taken delivery of in the May futures market, and which Rollins had sold to the debtor, would be carried to the July futures market, at which point the debtor would deliver the cotton against the July futures contract, and the profits would be split between the debtor and Rollins. Under this agreement, when the debtor placed the cotton on the floor of the New York Cotton Exchange and it had been accepted by a buyer for delivery, Rollins would invoice the buyer for the cotton in the name of The Julien Company. After The Julien Company was paid, it would in turn pay Rollins.

26. This agreement was in essence a forward contract obligating the debtor to take delivery of the Rollins' cotton at a future date.

27. Exhibit 1 to the Donna Elzie deposition reflects an invoicing by Rollins on July 5, 1989; however, some of that cotton was pulled off the market. Thus, only a portion of the cotton was paid for in July, 1989.

28. Exhibit 2 to the Elzie deposition represents a Rollins' invoice for cotton that could not be pulled off the market.

29. Exhibit 4 to the Elzie deposition represents a Rollins' invoice for 13,885 certificated bales, which invoice was paid.

30. In early July, 1989, after delivery of 79,044 bales, the debtor asked Rollins to repurchase approximately 65,000 bales of the certificated cotton, which the debtor had previously repurchased from its July futures contract buyers.

31. Mr. Stuart H. Frazer met with Julien Hohenberg in Memphis and agreed that Rollins would finance the debtor's repurchase of the approximately 65,000 bales as that cotton was delivered to the debtor by commission houses. Both Rollins and the debtor would have an equal opportunity to merchandise this cotton for a profit, which profits would be split equally between these two parties. If the cotton could not be merchandised for a profit, the debtor would repay Rollins for the unsold cotton on or before the "first notice day" for October delivery on the New York futures contracts. The "first notice day" is defined as the first day that the owner of a short futures contract can provide notice of his intention to deliver cotton on the spot futures month, and the "first notice day" is generally five business days from the end of the month preceding the spot futures month. Upon the "first notice day" one may deliver physical cotton against a futures contract.

32. It was also agreed that Rollins would charge the prime rate of interest for its advance of funds and would be reimbursed by the debtor for Rollins' carrying charges on the repurchased cotton.

33. Between July 6 and 27, 1989, approximately 65,000 bales of certificated cotton were repurchased by the debtor and paid for by Rollins for a total price of $21,570,611.77.

34. As Rollins paid for the repurchased cotton, it took possession of the certificated warehouse receipts for that cotton.

35. In August, 1989, the debtor pursued its decision to decertificate and subsequently recertificate the repurchased cotton so as to remove overage penalties which accrued on bales of cotton which had been certificated four months or longer. Decertification requires notification of the proper cotton exchange that the cotton is to be removed from the certificated classification. The decertificated cotton may then be resubmitted for classification by the United States Department of Agriculture ("USDA"). If the USDA so certifies, then the bales are recertificated as tenderable on the New York futures contracts, and, as a result, all overage penalties are removed. The debtor represented to Rollins that this decertification/recertification procedure was less expensive than the accruing overage penalties. In order to accomplish its purpose, the debtor required possession of the certificated cotton warehouse receipts. Timing was critical in this transaction.

36. Rollins had retained possession of the warehouse receipts on the certificated cotton and when Rollins received the farmer's trust receipts, Rollins released certificated warehouse receipts to the debtor.

37. The debtor was still obligated to pay Rollins for the recertificated cotton on or before the "first notice day" for October delivery on New York futures contracts. Payment was ultimately made to Rollins from the debtor's account at BTCo.

38. There were several extensions requested and granted of the original time for payment for the certificated warehouse receipts from the first notice day of October (which was late in September, 1989) to October 26, 1989.

39. On October 24, 1989, the debtor wired $1,215,000.00 to Rollins, and on October 26, 1989, the debtor wired $20,813,569.52 to Rollins.

40. On October 27, 1989, after receipt of the wire transfers, at the request of Mrs. Elzie, Rollins delivered the two farmer's trust receipts [see Stipulations 56–62] to the debtor by Federal Express.

41. Exhibits 1 through 9 to the Frazer affidavit are admissible. [Exhibits 7, 12 and 13].

42. The applicable price for the earliest future contracts on the New York market were as follows:

| On October 24, 1989 | (date of payment) | 73.38 cents per pound |
| On October 26, 1989 | (date of payment) | 74.18 cents per pound |
| On January 10, 1990 | (date of bankruptcy) | 65.48 cents per pound |

43. A contract for forward delivery of cotton, pursuant to Rule 29 of the Southern Mills Rules, is based on a net weight of 500 pounds per bale.

44. The futures market can be used to hedge one's position. If one is long on physical possession and short on futures in corresponding amount, that hedge provides some insurance on price.

45. A futures account is set up for the buying and selling of futures.

46. The spot market represents cotton traded daily on the street. That market price fluctuates according to variables such as the availability of a specific quality of cotton.

47. Andrew Halle, Vice President of BTCo and the account manager for the debtor's account was not involved in the structuring of the Julien/Rollins deal; however, he was aware of it. In fact, Mr. Hohenberg had approached Mr. Halle about BTCo financing the cotton repurchase and BTCo had declined.

48. L & S was formed around May, 1988, and shortly thereafter became a cotton collateral subcustodian for BTCo for The Julien Company's account.

49. The debtor paid for L & S's services. Exhibits 10 and 11 to the Ludwick deposition [Exhibits 1 and 2] generally describe the relationship between L & S and BTCo.

50. William Wirt Ludwick of L & S was involved in maintaining an inventory of that portion of the debtor's collateral held by L & S. L & S had the responsibility of holding that portion of the collateral of the debtor for BTCo. The collateral consisted of warehouse receipts and cotton equities. Among other things, L & S's work involved tracking warehouse receipts in hand and in transit.

51. L & S opened facilities in the Union Planters Bank Building. L & S's offices were contiguous to the debtor's facilities but L & S had separate entrances. The debtor had two employees who worked in the L & S offices pulling and filing warehouse receipts.

52. The warehouse receipts on hand at L & S were retained in a vault in L & S's offices.

53. It was the responsibility of L & S to maintain a physical count ledger, broken down by warehouse, of the warehouse receipts delivered to it by debtor's employees and others.

54. L & S reported daily to BTCo on the physical warehouse receipts it held as well as on receipts in transit. The daily collateral report form contained a place for listing of warehouse receipts on hand in the vault, of receipts held by other collateral subcustodians, of mill transit, of export transit, of trust receipts, of certificated bales, and of farmer's trust receipts. L & S also generated separate mill and port reports to account for cotton in transit. L & S also maintained the debtor's inventory subject to trust receipts, evidencing, for example, inventory removed from L & S. The debtor did not maintain a formal record, independent of L & S's records, of the number of warehouse receipts in the possession of L & S at a given time. However, Mrs. Elzie did maintain records of the debtor's total collateral on her computer.

55. L & S also maintained records of the debtor's cotton being held by other collateral subcustodians. The expertise required by L & S was accounting ability to keep track of documents.

56. There is a form of trust receipt called a "farmer's trust receipt" which may

be issued to evidence that cotton documents or warehouse receipts are in the possession of L & S but are held for some purpose. Such a trust receipt represents cotton documents, not specific bales of cotton.

■ 57. In the cotton industry, a warehouse receipt is a negotiable, bearer instrument representing ownership.

58. Mr. Ludwick estimated that L & S signed no more than fifteen farmer's trust receipts.

59. The two farmer's trust receipts involved in this case were the first two that L & S ever prepared.

60. Donna Elzie's requests for L & S to issue the two farmer's trust receipts were made on the same dates shown on Exhibits 7 and 8 to the Elzie deposition [Exhibits 4 and 6].

61. Trial Exhibit 33 is composed of the copies of the August 15, 1989 letter from Wirt Ludwick to Andrew Halle with Andrew Halle's handwritten responses [see Exhibit 3] and the completed August 15, 1989 farmer's trust receipt [see Exhibit 4], which were sent by telecopy to Rollins on August 15, 1989, before Rollins released any of the certificated warehouse receipts.

62. Trial Exhibit 34 is composed of the copies of the August 23, 1989 letter from Wirt Ludwick to Andrew Halle with Andrew Halle's handwritten response [see Exhibit 5], which was sent by telecopy to Rollins on August 23, 1989, and the completed August 23, 1989 farmer's trust receipt [see Exhibit 6], which was sent by telecopy to Rollins on August 24, 1989, before Rollins released additional certificated warehouse receipts.

63. L & S was aware that Rollins was involved in the trust receipt transaction, although Mr. Ludwick denied having knowledge of the extent of Rollins' interest in the warehouse receipts described in the two farmer's trust receipts.

64. L & S's collateral report number 315 [Exhibit 8, page 704558] reflects that on August 16, 1989, a deduction was made in the collateral corresponding to the August 15 farmer's trust receipt. The same is true as to the collateral report number 322 [Exhibit

9, page 704175] as it relates to the two farmer's trust receipts as of August 25, 1989.

65. Page 704230 of Exhibit 18 to Ludwick's deposition [Exhibit Ex. 9] shows, under "bales carried under trust receipt," the 68,640 bales blocked on account of the Rollins' trust receipts.

66. Collateral report number 366 dated October 28, 1989, on page 703948 [Exhibit 10] reflects the 68,640 bales still blocked.

67. Collateral report number 367 dated October 30, 1989 [Exhibit 11], on page 703927, reflects that the 68,640 bales were now unblocked.

68. The collateral reports were all maintained in the ordinary course of business of L & S.

69. Collateral report number 315 at page 704558 [Exhibit 8] reflects 32,200 certificated bales, although L & S did not actually receive the warehouse receipts for the certificated cotton.

70. Exhibit 18, at page 704175 [Exhibit 9], reflects 62,400 certificated bales. L & S did not actually receive the warehouse receipts for the certificated cotton.

71. The certificated cotton was reflected on Exhibits [8] and [9] (at pages 704558 and 704175) as being "in transit."

72. Rollins did not have a security agreement signed by the debtor with respect to the 62,400 certificated warehouse receipts held by Rollins and released to the debtor.

73. Rollins did not have a security agreement signed by the debtor with respect to the 68,640 uncertificated warehouse receipts at issue in this case (the "68,640 Uncertificated Warehouse Receipts").

74. Rollins did not file a UCC financing statement with respect to the 68,640 uncertificated warehouse receipts.

75. At all times between August 1, 1989, and November 1, 1989, L & S had at least 68,640 uncertificated warehouse receipts on hand.

76. Prior to receiving the two trust receipts dated August 15, 1989 [Exhibit 4] and August 23, 1989 [Exhibit 6], Rollins never

gave or accepted a trust receipt in a transaction involving a cotton merchant.

### CONCLUSIONS OF LAW:

### PREFERENCES

 Under § 547(b)(5) a comparison must be made between what the defendant creditor actually received and what it would receive in a hypothetical chapter 7 distribution. A trustee must prove that the creditor received more in the suspect transfer than it would have received in a chapter 7 liquidation, assuming that the suspect transfer had not been made. 3 WILLIAM L. NORTON, JR., NORTON BANKRUPTCY LAW AND PRACTICE 2d, § 57:9 (1994) (hereinafter "NORTON"). The hypothetical chapter 7 analysis is made as of the date of the bankruptcy filing. *Taunt v. Fidelity Bank of Michigan (In re Royal Golf Products Corp.)*, 908 F.2d 91, 95 (6th Cir.1990); *Neuger v. U.S. (In re Tenna Corp.)*, 801 F.2d 819, 823 (6th Cir.1986). Section 547(b)(5) most commonly affects transfers to unsecured creditors. *See, e.g., Elliott v. Frontier Properties/LP (In re Lewis W. Shurtleff, Inc.)*, 778 F.2d 1416, 1421 (9th Cir.1985). If a creditor is properly secured and a transfer is made to that creditor, prior to the bankruptcy and in satisfaction of the creditor's lien, to the extent that the transfer does not exceed the value of the creditor's lien, the creditor's position is not improved by the transfer and no preferential effect results. *See, e.g., Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936); *see generally*, 3 NORTON § 57:9; DAVID G. EPSTEIN, STEVE H. NICKLES & JAMES J. WHITE, BANKRUPTCY § 6–20 (1992). Generally speaking, "payment to a fully secured creditor does not diminish the value of the [bankruptcy] estate since, while cash is removed from the estate, the secured party's lien is reduced in equal amount. This same conclusion can be reached concerning any payment to the extent that it discharges a preexisting, valid lien that would be fully satisfied in bankruptcy." 3 NORTON § 57:9 at p. 57–42; *see also, In re Prescott*, 805 F.2d 719, 726 (7th Cir.1986); *Wilson v. First National Bank, Lubbock, Texas (In re Mission-*

*ary Baptist Foundation of America, Inc.)*, 796 F.2d 752, 759 (5th Cir.1986). In summary, as to a transfer to a fully secured creditor, if the debtor's estate is not depleted, there in fact may have been no preferential transfer. *See, e.g., Waldschmidt v. Mid–State Homes, Inc. (In re Pitman)*, 843 F.2d 235, 241 (6th Cir.1988). For purposes of § 547(b), intent of the parties is not a statutory element and is thus irrelevant. *See, e.g., T.B. Westex Foods, Inc. v. FDIC (In re T.B. Westex Foods, Inc.)*, 950 F.2d 1187, 1195 (5th Cir.1992). However, for purposes of the UCC at issue in this proceeding, the parties' intent may have some relevancy. *See, e.g., infra*, discussion of attachment and possession.

The determinative issue presented in this proceeding is whether Rollins was a secured creditor at the time of the two questioned transfers to Rollins. Further, if Rollins was secured, absent an agreement on value of the collateral, it normally must be determined whether it was a fully secured creditor or whether the transfers exceeded the value of the security held by or for Rollins. *See, e.g., Wickham v. United American Bank, et al. (In re Property Leasing & Management, Inc.)*, 46 B.R. 903, 911 (Bankr.E.D.Tenn. 1985). However, it has been agreed by the parties that value of the collateral is not disputed. Therefore, the resolution of whether Rollins was a fully secured creditor throughout the subject transactions turns upon an analysis of whether Rollins' security interest was attached to and perfected in certain uncertificated cotton warehouse receipts held by L & S. The outcome will be determined in large part by applicable UCC provisions. However, a resolution of this issue requires a practical examination of the relevant facts and an application of the appropriate law to those facts.

### UNIFORM COMMERCIAL CODE

Several issues exist in this proceeding that are controlled or influenced by the applicable UNIFORM COMMERCIAL CODE or TENNESSEE CODE ANNOTATED (hereinafter cited "UCC §" or "TENN.CODE ANNOT. §") provisions, as adopted in Tennessee, as Tennessee law con-

trols these transactions.[2] TENN.CODE ANNOT. § 47–9–103(1)(b) (1992) provides:

> 47–9–103. Perfection of security interests in multiple state transactions.—
>
> (1) DOCUMENTS, INSTRUMENTS AND ORDINARY GOODS.
>
> (b) Except as otherwise provided in this subsection, perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

At issue in this proceeding is substitution collateral, consisting of uncertificated cotton warehouse receipts, which was in the physical possession of L & S in Memphis, Tennessee.

## CREATION OF SECURITY INTEREST: ATTACHMENT AND ENFORCEABILITY

██ Article 9 of the UCC "attempts to provide a simple, effective system of creating and perfecting, and determining the priority of, security interests in personal property in a manner that facilitates financing transactions in the real world." STEVEN O. WEISE, *Perfection By Possession: The Need For An Objective Test,* 29 IDAHO L.REV. 705, 706 (1992) (hereinafter "WEISE"). The goal is carried out by rules that lead to predictability in the financial marketplace. *Id.* Generally, courts should be expected to apply the UCC's rules. *Id.* That is because, at least in part, failure to apply the rules in a given factual scenario leads to uncertainty in the results when similar facts arise. *Id.* However, the UCC does not always provide a rule, or as in this adversary proceeding, the applicable UCC provision is open to interpretation. Fortunately, the facts in this proceeding are so unique that the Court has no concern that its interpretation and application of the UCC will lead to uncertainty in or disruption of future financial transactions. However, the Court has looked for objective

evidence of the existence of a bailee, as well as of attachment and perfection. These require separate evidentiary inquiries. *See generally* WEISE, *supra.*

Under Article 9 of the UCC, as adopted in Tennessee, a security interest is created, or attaches, by the accomplishment of "four seemingly simple steps:"

(1) Enter into a security agreement with the debtor,

(2) Reduce necessary parts of the agreement to a writing signed by the debtor, or obtain possession of the collateral pursuant to agreement,

(3) See to it that the debtor has "rights in the collateral," and

(4) Give value.

[2] JAMES J. WHITE AND ROBERT S. SUMMERS, UNIFORM COMMERCIAL CODE 3rd § 24–2, at 297 (1988) (hereinafter "WHITE AND SUMMERS"); TENN.CODE ANNOT. § 47–9–203(1) (1992). At no time, in the present case, did Rollins have a written security agreement with the debtor; therefore, this entire examination will be one involving the requisites of a valid oral security agreement accompanied by the secured party's possession of the collateral. That inquiry is more interesting here as a result of the possession of the uncertificated cotton warehouse receipts being in a third party (L & S) rather than in the purported secured party (Rollins). However, it should be noted that Rollins did have possession of two documents, the farmer's trust receipts, that served some collateral functions, to be more fully explored in the discussion of the facts.

The only element of attachment that is in dispute is the possessory element. Article 9 of the UCC "deals with consensual financing arrangements." THOMAS M. QUINN, 2 QUINN'S UNIFORM COMMERCIAL CODE COMMENTARY AND LAW DIGEST 2D § 9–203[A][4], at 9–170 (1991) (hereinafter "QUINN"). "A secured party's mere possession of collateral is not sufficient to establish a security interest." *Grossman v. Saunders,* 237 Va. 113, 376 S.E.2d 66, 8 UCC Rep.Serv.2d 214, 219

---

**2.** Compare *In re Alcom America Corporation,* 154 B.R. 97, 104 (Bankr.D.D.C.1993) ("[W]here the relevant UCC provisions are identical in all material respects, the controlling law should be the

same in each state.") (citing 1 RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 1–105(8) (1985)).

(1989). There must also be an agreement. *Id.;* UCC § 9–203(1)(a). It is undisputed that there was an oral security agreement between the debtor and Rollins. Moreover, Rollins gave the debtor value in the form of a loan, and the debtor had ownership rights in the uncertificated cotton warehouse receipts that were held by L & S in a collateral pool.

■ Attachment is important independently when there is a dispute under UCC Article 9, either between competing unperfected secured creditors, between the secured creditor and the debtor, or between a secured creditor and other nonpriority creditors (such as unsecured creditors). 8 WILLIAM D. HAWKLAND, RICHARD A. LORD & CHARLES C. LEWIS, 8 UNIFORM COMMERCIAL CODE SERIES § 9–203:303, at 640 (1990) (hereinafter "HAWKLAND"). There is no dispute at issue between competing secured creditors, except for the bifurcated potential dispute between BTCo and Rollins and that is not ripe for decision at this time. There is no dispute whatsoever between the prebankruptcy debtor and the secured creditor Rollins. There is, however, a dispute between the Trustee, acting on behalf of unsecured creditors, and Rollins.

The more typical reported UCC decisions on attachment involve drafting, collateral description, or other sufficiency issues relating to the written security agreement. *See, e.g.,* 2 WHITE and SUMMERS § 24–3. As stated, this proceeding involves a possessory security interest, what the common law called a "pledge." *See generally* JOHN J. WORLEY, *Possessory Security Interests, in* 1A SECURED TRANSACTIONS UNDER THE UNIFORM COMMERCIAL CODE § 6A.01 (Peter F. Coogan, et al. eds. 1993) (hereinafter "WORLEY"). This possessory or pledge technique served to "protect the reliance interests of third persons who might deal with the debtor's unencumbered property" and to "protect the secured creditor against risks associated with loss of the collateral." WORLEY § 6A.01[1], at 6A–3, 4. Article 9 of the UCC continues the pledge concept of possessory security interests "in certain kinds of collateral." WORLEY § 6A.01[2], at 6A–5. "A key element of the pledge was possession of the collateral by the secured party or one hold-ing for the secured party." ROBERT M. LLOYD, *Secured Transactions, in* 3 DEBTOR–CREDITOR LAW § 15.01[A][1], at 15–8 (Theodore Eisenberg, ed. 1994) (hereinafter "LLOYD"). As the Trustee and BTCo contend that Rollins' security interest never attached to the collateral that was in the possession of the third party, L & S, it is necessary to analyze the UCC and to determine whether it permits such attachment. In that analysis, more will be said about the concepts of a pledge.

■ Attachment, as distinguished from perfection, is directed toward the creation of the security interest. Attachment is a prerequisite to the secured party's ability to enforce the security interest first against the debtor and second against third parties. TENN.CODE ANNOT. § 47–9–203(1) (1992); 2 WHITE AND SUMMERS § 24–1, at 296; 8 RONALD A. ANDERSON, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 9–203:50 (1985) (hereinafter "ANDERSON"); 2 QUINN § 9–203[A][1], at 9–168; *compare* 8 HAWKLAND § 9–203:303 (stating that both attachment and enforceability are included in § 9–203). Assuming that the security interest attached to the collateral, the next concern is whether the secured party has "priority against third persons claiming an interest in the same collateral," and this level of inquiry is one of perfection of the security interest. WORLEY § 6A.01[2][b], at 6A–7. "The essence of the perfection process is furnishing public notice of the secured party's interest in the collateral, thereby protecting third persons against the secret or undisclosed lien." *Id.* Thus, "[t]he most common method for perfecting a security interest is by filing a financing statement." *Id.;* TENN.CODE ANNOT. § 47–9–302 (1992). This filing method gives notice to the world of the secured party's interest. *See generally* 2 WHITE AND SUMMERS § 24–13.

There is a tendency for cases and authorities to discuss attachment and perfection without making a clear distinction between the two. *See, e.g.,* WORLEY § 6A.03[1], at 6A–15, 16 (discussing *Transport Equipment Co. v. Guaranty State Bank,* 518 F.2d 377 (10th Cir.1975) which case concerned a failed attempt to achieve perfection by combining elements of filing with elements of posses-

sion); LINDA C. SALEM AND GARY D. SAMSON, PERFECTION BY POSSESSION AND FILING, (Practising Law Institute 1986) (stating that a written security agreement is unnecessary when "perfection" is by possession in a secured party or its bailee but citing UCC § 9–203); *compare In re Fund Raiser Products Co., Inc.,* 163 B.R. 744 (Bankr.E.D.Pa.1994) (discussing perfection through possession in an agent of creditor without discussing attachment); *Rodney v. Arizona Bank,* 172 Ariz. 221, 836 P.2d 434, 17 UCC Rep.Serv.2d 886, 892–3 (App.1992) (citing A.R.S. §§ 47–9203(A) and 47–9305, the court stated that a secured party may "perfect" by taking possession but here the secured party never had possession of the collateral, yet "took constructive possession" when it notified holder of collateral of its security interest). This tendency likely is attributable in the typical case to the absence of a dispute over attachment. Subsequent to this Court's summary judgment opinion in this proceeding, at 127 B.R. 604, the parties and the Court have focused on attachment as a separate and critical element of Rollins' status as a secured creditor. This focus can be somewhat blurred by the realization that a possessory security interest is a stake and, thus, possession will be an element of both attachment and perfection in this proceeding.

The Court's research indicates that commentators of course draw distinctions between attachment and perfection but recognize that possession is a common element and, thus, often discuss concepts of possession as if those concepts apply to both attachment and perfection. *See, e.g.,* WORLEY § 6A.03; *compare* WEISE, at 706–707 (stating that courts should consider the policies of the UCC in defining possession). The HAWKLAND treatise states that "[t]he concept of attachment cannot be considered in the abstract. It only makes sense when one realizes that attachment is a prerequisite to perfection." HAWKLAND § 9–203:303, at 637. However, the Trustee and BTCo make policy arguments in this proceeding that possession by a bailee should never satisfy the attachment requirements for creation of a security interest, and the Court has examined that issue.

The official comments to UCC § 9–203(1)(a) indicate that its attachment requirements are evidentiary in nature. TENN.CODE ANNOT. § 47–9–203(1)(a), comment 3. This comment states that "[w]here the collateral is in the possession of the secured party, the evidentiary need for a written record is much less than where the collateral is in the debtor's possession; customarily, of course, as a matter of business practice the written record will be kept, but, in this Article [Chapter] as at common law, the writing is not a formal requisite." *Id.* Also, the comments refer to the writing requirements as a statute of frauds. TENN.CODE ANNOT. § 47–9–203(1)(a), comment 5. "Unless the secured party is in possession of the collateral, his security interest, absent a writing which satisfies paragraph (1)(a) is not enforceable even against the debtor, and cannot be made so on any theory of equitable mortgage or the like." *Id.*

■ From this Code section and its comments, we know that the secured party's possession is one method of attaching that party's security interest to the collateral. However, Rollins is seeking to establish security in the uncertificated cotton warehouse receipts that were held by L & S and never by Rollins. Thus, the critical inquiry is whether L & S's possession is sufficient to satisfy Rollins' attachment requirements. Generally, for both attachment and perfection, "[t]he secured party's 'possession' should be of a type that would place a reasonable third person on notice that someone other than the owner of the collateral may claim an interest in the property." WEISE, at 707–708. BTCo and the Trustee assert that this is the narrow issue upon which the outcome is determined, and they argue that, like § 547(b), UCC § 9–203(1)(a) establishes objective standards. More specifically, BTCo and the Trustee assert that the subjective intent of Rollins and/or the debtor at the time of these transactions is unimportant. BTCo argues for strict compliance with UCC 9–203(1)(a)'s language that the collateral must be "in the possession of the secured party." TENN.CODE ANNOT. § 47–9–203(1)(a) (1992). In contrast to the perfection phase under UCC §§ 9–304 and 9–305, this attachment statute does not mention possession in

a third party, such as a bailee, as a means of the secured party's accomplishing the necessary attachment.

As previously noted, Rollins did obtain, contemporaneously with its surrender of the certificated cotton warehouse receipts to the debtor, two nonnegotiable farmer's trust receipts signed by L & S. It could be concluded that these two trust receipts were sufficient indicia of control over the blocked uncertificated cotton warehouse receipts so as to place actual possession of the collateral in Rollins. Stipulation 56 does state that such a trust receipt "represents cotton documents." An expert witness, Mr. Colby, by affidavit testified that such trust receipts were common in the cotton business and entitled the holder to possession of the cotton documents described therein. Exhibit 16. There is no proof in the record to refute Mr. Colby's statements; although his testimony may be a conclusion of law rather than statements of opinion on the facts. Under the trust receipt theory it would not be necessary to further discuss L & S's role as a bailee or the ability of a bailee's possession to satisfy UCC § 9–203(1)(a). The Court finds significant merit to that theory under the particular facts of this proceeding; however, since possession of the uncertificated cotton warehouse receipts never left L & S, the role of L & S will be explored.[3]

It has been necessary to examine the evidentiary facts presented in this proceeding to determine if L & S was a bailee for Rollins, and the Court will discuss those facts later in this opinion. For purposes of placing the legal analysis in perspective, it should be noted that the facts do establish that L & S acted as a collateral bailee on behalf of Rollins.

The collateral for which L & S acted as a bailee was the uncertificated cotton warehouse receipts, not the certificated cotton warehouse receipts. The requirements for an actual bailment include "delivery [of personalty for a particular purpose] and acceptance pursuant to an agreement," but "a

bailment may result from conduct." *Craig v. Union County Bank (In re Crabtree)*, 48 B.R. 528, 532 (Bankr.E.D.Tenn.1985); *Merritt v. Nationwide Warehouse Co., Ltd.*, 605 S.W.2d 250, 252–53 (Tenn.App.1980). "[B]ailment is a consensual relationship that can be established by express contract or implication." *Coral Petroleum, Inc. v. Paribas (In re Coral Petroleum, Inc.)*, 50 B.R. 830, 839 (Bankr.S.D.Tex.1985).

■ "[T]he creation of a bailment requires that possession and control pass from [the] bailor to bailee; there must be full transfer, actual or constructive, so as to exclude the property from the possession of the owner and all other persons and give the bailee sole custody and control for the time being." *Burwil Const. Co. v. E. Luke Greene Caulking Contractors, Inc.*, 1989 WL 105650, at *2 (unreported Tenn.App. Sept. 13, 1989) (quoting *Merritt v. Nationwide Warehouse Co., Ltd.*, 605 S.W.2d at 253). Here, L & S already had possession of the uncertificated cotton warehouse receipts. The fact that a bailee already had possession of collateral before the creation and perfection of a security interest is not significant. That will be typical where the bailee has an existing relationship with the debtor. *See Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Van Kylen (In re Van Kylen)*, 98 B.R. 455, 467 (Bankr. W.D.Wis.1989) (citing J. WORLEY, *Possessory Security Interests* § 14.02[2][a][ii], at 14–48). What is significant is the change in control over the collateral held by the bailee. The importance of control over collateral will be seen not only in the creation of a bailment but also in the issue of the secured party's possession. "One who controls the collateral possesses it, and leads others to believe it is his." *Finance Company of America v. Hans Mueller Corporation (In re Automated Bookbinding Services, Inc.)*, 471 F.2d 546, 552 (4th Cir.1972). Here, L & S exercised control over those receipts by blocking them for the benefit of Rollins. This blocking effectively prevented the debtor or other persons from exercising control over or posses-

---

**3.** There are also other questions presented by a pledge of a nonnegotiable document, including whether such a document gives third parties sufficient notice of the secured party's claim to

the collateral. *See, e.g.,* HAROLD R. WEINBURG *Documents of Title, in* 3 DEBTOR-CREDITOR LAW § 14.-07[c], at 14–89 (Theodore Eisenberg, ed. 1994).

sion of the collateral. There is, if not an actual, a constructive bailment, "where a person having possession of a chattel holds it under such circumstances that an obligation to deliver it to another is imposed by law." *In re Crabtree*, 48 B.R. at 532. The discussion of the facts will reveal a finding that L & S assumed an obligation to hold collateral until Rollins was paid in full, at which point the collateral was released back into the collateral pool for the benefit of BTCo or other secured creditors.

The requisites for a bailee in secured transactions are found in the perfection section of the UCC. Section 9–305 requires that

> (i) a bailment relationship must exist between the debtor and the third party in possession of the collateral, and (ii) the bailee must receive notification of the secured party's interest.

WORLEY § 6A.04[2][a], at 6A:50; *see also, id.* § 6A.04[2][e][ii], at 6A–78–79 (discussing Section 8 of Restatement of Security, "the historical antecedent to the Code's bailee-with-notice concept"). Looking to the common law for definition of bailment, "[t]he essential element of a bailment is possession ..., and so it generally is held that there must be some assent of the bailee to hold the property on behalf of the bailor." *Id.* The bailee must have notice of the secured party's interest, a concept that is defined at TENN.CODE ANNOT. § 47–1–201(25) (1993 Supp.) and that will be analyzed under the perfection section of this opinion as well as in the factual discussion.

█ In order to act as bailee for a secured party, it is axiomatic that the debtor not have control over the bailee. *Hale v. Kontaratos (In re Kontaratos)*, 10 B.R. 956, 969 (Bankr.D.Me.1981) ("Where the debtor controls the bailee, he controls the collateral notwithstanding its physical possession by the bailee."). However, the mere absence of debtor control "does not automatically qualify the person in possession as a 'bailee.'" WEISE, at 714.

█ It is sufficient that the bailee is not the debtor or controlled by the debtor. *In re Atlantic Computer Systems, Inc.*, 135

B.R. 463, 467 (Bankr.S.D.N.Y.1992) (citing *In re Copeland*, 531 F.2d 1195, 1204 (3rd Cir. 1976)). Also, it is not necessary for the secured party to have "sole dominion and control" over the bailee. *The Merchants Bank v. Reddington/Sunstar Limited Partnership (In re Reddington/Sunstar Limited Partnership)*, 100 B.R. 1, 4 (Bankr.D.Ariz. 1988) (discussing Tennessee law and quoting *In re Copeland*, [531 F.2d 1195, 1204], 18 UCC Rep.Serv. 833, 843 (3rd Cir.1976)). "A bailee may owe duties to both the debtor and the secured party and yet be a bailee under § 9–305." *Levey v. Burke, Wilson & McIlvaine (In re Bragiel)*, 151 B.R. 186, 189 (Bankr.N.D.Ill.1993). For both attachment and perfection purposes a court must look at all of the facts and circumstances to see if the debtor retains control over the alleged bailee. This is part of the totality of facts and circumstances analysis of whether a bailment exists. *In re Reddington/Sunstar Limited Partnership*, 100 B.R. at 6–7; *Ryen v. Terry (In re Terry)*, 56 B.R. 713, 715 (Bankr.W.D.N.Y.1986). "An implied-in-fact bailment is determined by the surrounding facts such as benefits received by the parties, the parties [sic] intentions, the kind of property involved and the opportunity of each party to exercise control over the property." *In re Coral Petroleum, Inc.*, 50 B.R. at 839 (citations omitted). Having found a bailment, a court must evaluate the objective proof relating to the alleged bailee's possession and determine if that possession is "such that a reasonable person would understand that the possession of the collateral by someone other than the borrower may mean that a third person claims a security interest in the property." WEISE, at 714. Thus, whether a bailment exists is a separate question from whether that bailment puts the third parties on notice of a potential secured claim. The latter issue is also fact driven.

Addressing specifically whether attachment of a security interest can be achieved by possession of the collateral by the secured party's bailee, an issue on which there is surprisingly little direct authority, the Trustee and BTCo point to UCC § 9–203(1)(a) and its comments. As previously noted, these do not specify that attachment, in contrast to perfection, can be achieved by possession by

a bailee. The Trustee and BTCo also argue that in the drafting process of the current UCC, possession in a bailee was rejected as a means of accomplishing the secured party's possession. *See* 8 KELLY, UNIFORM COMMERCIAL CODE DRAFTS at 309, 333, 339 (1984). The UCC draft § 8–203 states that a "pledge may be created by oral or written agreement." *Id.* § 8–203, at 309. Then, the draft at § 8–404 provides that a "pledge" is created when collateral "comes into or is in the possession of the lender, his agent or a bailee who has acknowledged that he holds the collateral for the lender." *Id.* § 8–404, at 339. Thus, it is argued, the drafts proposed attachment through a bailee's possession but the current UCC § 9–203(1)(a) omits such a reference. In essence, the Trustee and BTCo argue that the Code drafters made it clear when they intended for third party possession to suffice.

According to the relatively few authorities on point and the comments to UCC § 9–203, the drafter's intent is not clearly in support of the Trustee and BTCo who, for example, rely upon a conclusion, which has no foundational citation of authority, from a UCC treatise that there can be no enforceable security interest when "bailee-held property is not in the possession of the secured party." 8 ANDERSON § 9–203:42, at 685. As has been noted previously and as will be seen in the following discussion, the drafter's intent to retain a possessory pledge concept may logically infer an intent to allow a third party's possession to suffice for attachment. Judge Conrad K. Cyr, then a bankruptcy judge, pointed out that the second sentence from UCC § 9–305, concerning possession in a bailee for perfection purposes, is "cloned verbatim from section 8 of the Restatement of Security." *In re Kontaratos,* 10 B.R. at 963 n. 40. That Restatement, as previously observed, addressed the creation of a pledge by consensual possession in a third person who receives notice of the pledge. *Id.*

▇▇▇ The ANDERSON quote, relied upon by the Trustee and BTCo, begins with the word "[l]iterally" and is a part of a cautionary discussion that a secured party should avoid the uncertainties of possession by obtaining a "written security agreement when-

ever possible." 8 ANDERSON § 9–203:42, at 686. Is the statutory language of UCC § 9–203(1)(a) such that it excludes any possibility that a third party's possession will be sufficient for attachment? This Court does not believe that is so. The ANDERSON treatise, in another section discussing the Code's exceptions to a filing for perfection, states that the "common illustration" of a possessory secured transaction is a "pledge." 9 ANDERSON § 9–304:40, at 88. And, that treatise concludes that "[w]hether there is such possession as brings a transaction within the exception here noted is governed by pre-Code law." *Id.* at 89. As will be seen, common law included bailee possession in the concept of a pledge. Moreover, ANDERSON, in a section describing when a written security agreement is not required, states: "The possession of the agent of the creditor is possession of the creditor for the purpose of determining whether there is a binding security agreement although there is no written agreement." 8 ANDERSON § 9–203:19, at 671. This statement is contradictory to the initially quoted ANDERSON statement concerning possession in a bailee. If attachment literally requires possession by the secured creditor, possession in neither an agent nor bailee would suffice. ANDERSON reconciled the difference in the Code's language with the conclusion that "a pragmatic test will extend UCC § 9–302 and § 9–305 beyond their express letter so as to govern enforceability and attachment under UCC § 9–203." *Id.* § 9–203:42, at 686.

▇▇▇ While it is generally true that a court should apply a statute as written, U.C.C. § 9–203(1)(a) leaves room for interpretation of its requirement that "the collateral is in the possession of the secured party pursuant to agreement." First, the UCC itself provides that it "shall be liberally construed and applied to promote its underlying principles and policies." TENN.CODE ANNOT. § 47–1–102(1) (1992). Furthermore, "principles of law and equity" supplement the UCC "[u]nless displaced by the particular provisions of the Code" as enacted in Tennessee. TENN.CODE ANNOT. § 47–1–103 (1992). Sections 9–203(1)(a) and 9–302(1)(a) do not define "possession of the secured party." *See,*

*e.g., Raiton v. G & R Properties (In re Raiton)*, 139 B.R. 931, 937 (Bankr. 9th Cir. 1992) (observing, in a "perfection" case, that the UCC does not define "possession" and that the courts must "determine what constitutes possession"). As the Wisconsin Court of Appeals has recently observed in a case concerning perfection by possession: "Without a definition, 'possession' is protean and ambiguous." *National Pawn Brokers Unlimited v. Osterman, Inc.*, 176 Wis.2d 418, 500 N.W.2d 407, 21 UCC Rep.Serv.2d 1176, 1184 (Ct.App.1993). It is obvious that attachment by possession requires secured party possession, but it is not obvious that such possession is restricted literally to the secured party as opposed to a third party acting on behalf of the secured party. If that were obvious, the comment to the Code would be different than it is. *See* Comment 1 to UCC § 9–203(1)(a), discussed previously and later in this opinion.

The Court has been reminded by BTCo that its earlier opinions in this case have applied the UCC as written. *See, e.g., Plains Cotton Cooperative Association of Lubbock, Texas v. The Julien Company, et al. (In re The Julien Company)*, 141 B.R. 359 (Bankr.W.D.Tenn.1992). There, however, the issues and facts were related to the extent to which a warehouseman's lien reaches under UCC § 7–209. The Court concluded that the specific language of UCC § 7–209 controlled the outcome. *Id.* at 370. Here the statute does not provide a specific meaning to a critical term: possession.

The recognized commentators do not always aid in the effort to give meaning to the possessory requirement of UCC § 9–203(1)(a). For example, Professors White and Summers do not address whether possession by a bailee satisfies the attachment requirements of UCC § 9–203. They do "note in passing that the taking of possession is not only a perfecting act but also one which satisfies the Article Nine Statute of Frauds embodied in section 9–203(1)." 2 WHITE & SUMMERS § 24–12, at 350. This observation is made in the section of their treatise discussing perfection by possession. *Id.,* at § 24–12. And, it is followed by a discussion of the meaning of "possession," which refers to "several hundred years of cases and . . . the policy of Article Nine" for assistance in a definition. *Id.,* at 350. This discussion implicitly suggests the same definition for possession, which includes certain bailments, for both attachment and perfection.

Other authorities recognize that "[t]he drafters obviously intended to leave possession to be fleshed out by case law." 8 HAWKLAND § 9–305:03, at 1049. As possession is not defined for any part of Article 9, the HAWKLAND conclusion would be as true for UCC § 9–203 as for § 9–305. That treatise further finds UCC §§ 9–203(1), 9–302(1)(a) and 9–305 to be indicia of the Code drafter's continuing the availability of the common law pledge. *Id.* § 9–203:04, at 652. While acknowledging that it is less than obvious that "constructive possession may be available to the secured party to establish the attachment and enforceability" of a security interest, HAWKLAND refers to comment 1 to UCC § 9–203 to conclude that the secured party's possession may be accomplished through agency. *Id.,* at 653–654. That treatise logically concludes: "When possession is the triggering event, attachment, enforceability and perfection will all occur simultaneously as a result of the simple act of possession." *Id.,* at 652.

Under a discussion of creation of a possessory security interest, Professor Worley states that "the secured party may take possession of the collateral itself or through an agent. Similarly, a third person may have possession of the property, holding the property as bailee or claiming some interest in the property for himself." WORLEY § 6A.02[2], at 6A–13. The rationale behind this conclusion is that possessory security interests are extensions of the common law pledge, to which courts have looked to give meaning to the term "possession," which, as noted previously, is not defined in the UCC. *Id.* In this common law context, possession required: "(i) exclusive dominion and control over the property and (ii) an intent to exclude others from such control." *Id.*

Professor Worley next discusses the requisites of possession, agreeing that the UCC drafters "intended for the content of the idea

to be filled in by case law." WORLEY § 6A.03[1], at 6A–13. Then, he recognizes that "[i]n the absence of a written security agreement, possession will ordinarily act both to establish attachment to the security interest and to perfect the interest as well. With a possessory security interest, attachment and perfection occur simultaneously by virtue of the secured party's possession." *Id.,* at 6A–15.

In contrast to ANDERSON's treatise, a part of which was relied upon by the Trustee and BTCo, a legal encyclopedia, also without citation of supporting authority other than UCC § 9–305, states that

a security interest cannot be enforced and does not attach unless the creditor has possession of the collateral under an oral or written security agreement, or the debtor has signed a written security agreement containing a description of the collateral. If the collateral is in the possession of a bailee, a secured party is deemed to have possession of it from the time the bailee receives notification of the secured party's interest.

68A AM.JUR.2d., *Secured Transactions* § 277, at 259–60 (1993).

This indicates that attachment can be achieved by possession by a bailee; although, that writer blurs the distinction between attachment and perfection by relying on UCC § 9–305, a perfection statute. However, there is a reason for this reliance. Comment 1 to UCC § 9–203 states that "the agreement must be in writing unless the collateral is in the possession of the secured party (including an agent on his behalf—see Comment 2 to Section 9–305)." TENN.CODE ANNOT. § 47–9–203(1), comment 1 (1992). Thus, the comment to the attachment statute contains a direct reference to a paragraph of the comments to the perfection statute, UCC § 9–305, that discusses possession by a bailee. That latter comment provides:

Possession may be by the secured party himself or by an agent on his behalf; it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party. See also the last sentence of Section 9–205. Where the collateral (except for goods cov-

ered by a negotiable document) is held by a bailee, the time of perfection of the security interest, under the second sentence of the section, is when the bailee receives notification of the secured party's interest; this rule rejects the common law doctrine that it is necessary for the bailee to attorn to the secured party or acknowledge that he now holds on his behalf.

TENN.CODE ANNOT. § 47–9–305, comment 2 (1992).

As previously observed, it is common for the UCC authorities to discuss possession for perfection purposes and attachment purposes as if the same possession serves both purposes. *See, e.g.,* IV THOMAS D. CRANDALL, MICHAEL J. HERBERT & LARY LAWRENCE, UNIFORM COMMERCIAL CODE §§ 24.2, 25.12.1 & 25.12.2 (1993) (hereinafter "CRANDALL"). It may be logically argued that the official comments anticipate application of a meaning to possession that would be the same for attachment as for perfection. The Trustee and BTCo here argue that the statute of frauds function is not served if attachment may be achieved through a third party's possession of the collateral. That might be true if the possession were a hidden one. Here, all of the parties knew that L & S held certain of the debtor's collateral. More specifically, the parties knew that L & S had blocked on its books certain uncertificated cotton warehouse receipts for the benefit of Rollins. Of course the debtor, as distinguished from the Trustee, did not dispute the attachment or perfection of Rollins' security interest. Moreover, the commercial world that may have attempted to gain some interest in the debtor's cotton inventory would have learned, of necessity, that L & S held and blocked the uncertificated cotton warehouse receipts, which are the negotiable instruments by which title to cotton is transferred. This is consistent with the pre-UCC "pledge of an instrument representing goods, such as a warehouse receipt, [which] created a security in both the instrument and the goods." LLOYD ¶ 15.01[A][1], at 15.08. The facts here do not suggest an attempt or possibility of a secret lien in favor of Rollins.

■ The concern over the statute of frauds function of UCC § 9–203 is misplaced

in this proceeding. "A statute of frauds requirement on the model of [UCC §] 2–201 merely contemplates objective indicia of the possibility of an underlying actual agreement (here an agreement for security)." 2 WHITE and SUMMERS § 24–3, at 299–300. UCC § 9–203 permits alternative attachment methods, one by a written security agreement, to which the statute of frauds clearly applies. The other method is possession by a secured party, wherein the possession itself is the objective evidentiary equivalent of a written agreement. This Court is persuaded by the logically correct view as expressed by Professor John J. Worley, who specifically noted that possession by a secured party "serves as a substitute for a written agreement and must perform the evidentiary functions that otherwise would be performed by the documents." WORLEY § 6A.01[2][a], at 6A–7.

In the context of the current dispute, Professor Worley further discusses agent and bailee possession and observes that for attachment purposes a focus on the "[p]ossession by the secured party or its agent" satisfies the concern whether the parties intended to create a security interest in specific property. Id., at 6A–22–23. Thus, the possession inquiry in the attachment phase is one directed toward the sufficiency of evidence that a security interest was created, and this Court believes that there should be objective proof on this issue. It would seem that this evidentiary purpose is satisfied in this case by the bailee's possession, when such possession alerted all real and potential parties that the collateral was held by L & S subject to an interest in favor of Rollins. "As a general principle, the method by which the secured party acquires possession of the collateral should be irrelevant, provided that the evidentiary [for attachment] and notice [for perfection] functions performed by possession are satisfied." Id., at 6A–27–28.

Professor Worley also discusses cases that have construed possession by third parties, both agents and bailee, in the context of attachment and perfection. Id. § 6A–04. When discussing an agent's possession, he observes: "Collateral in the possession of a third person controlled by the secured party evinces an intent to create an interest in the collateral securing the debtor's obligations and identifies the particular collateral subject to the interest to the same extent that the secured party's own possession does so." Id. § 6A.04[1], at 6A–43. Although it is not claimed that L & S was an agent for Rollins, the same evidentiary purposes may be served by L & S's bailee role. Once the bailee obtained notice of Rollins' interest, its obligations concerning the collateral changed and it assumed duties to the secured creditor, Rollins. "[T]he common law recognized notification to the third person as an appropriate means to create a pledge on account of the shift in fealty deemed to result from the bailee's receipt of notification." Id. § 6A.04[2][b], at 6A–53.

In the few cases discussing possession in the attachment context, it is common for the courts, as do the authorities discussed previously, to assume that possession may satisfy both attachment and perfection. For example, in *Hodges v. First National Bank of South Carolina (In re George B. Kerr, Inc.)*, 696 F.2d 990 (Table), 35 UCC Rep.Serv. 1289 (4th Cir.1982), an otherwise unreported case, the court concluded that "[a]lthough the bailee need not be an agent of the secured party, no debtor may exercise control over the bailee. Possession in this fashion obviates the need for either a written security agreement or a filed financing statement." 35 UCC Rep.Serv. at 1292 (citing S.C.Code Ann. §§ '36–9–203(1)(a), –302(1)(a)). This case dealt with a field warehouse arrangement and the court appears to have, at least in dicta, stated that attachment may be achieved through possession of the collateral by a bailee for the secured party. Rollins also relied upon the bankruptcy court's decision that was affirmed by the Court of Appeals for the Fourth Circuit, where the lower court also assumes that attachment can occur by possession by a bailee. *Hodges v. Anderson (In re George B. Kerr, Inc.)*, 25 B.R. 2, 7 (Bankr.D.S.C.1981), aff'd, 696 F.2d 990 (4th Cir.1982). That bankruptcy court commented that, where warehouse receipts were pledged to a creditor by the debtor, no written security agreement was required to render the security interest enforceable when the collateral was in the possession of a

bailee who had notice of the creditor's security interest. Further, an Indiana appeals court stated in a footnote that the secured party's possession through a depositary satisfied the alternative requirements of that state's UCC § 9–203(1). *Kruse, Kruse & Miklosko, Inc. v. Beedy, et al.,* 170 Ind.App. 373, 353 N.E.2d 514, n. 13, 20 UCC Rep.Serv. 217 (1976). *See also Chambersburg Trust Co. v. Eichelberger,* 403 Pa.Super. 199, 588 A.2d 549, 15 UCC Rep.Serv.2d 1080 (1991) (where court merged attachment and perfection and found that constructive possession was sufficient).

Another bankruptcy court has acknowledged that when the goods are in the possession of a bailee, determining whether the secured party possessed the goods is difficult. *In re Alcom America Corporation,* 154 B.R. 97, 105 (Bankr.D.D.C.1993). There, a warehouseman had possession of the collateral as a bailee and there was no written security agreement. For purposes of determination of the creation of a security interest by means of a bailee's possession, the *Alcom* court said that its inquiry involved the questions of "whether the parties intended the transfer of the nonnegotiable warehouse receipts to give [the creditor] the right to possess the [collateral]; whether the warehouseman was under control of the debtor; and whether the warehouseman received notice of [the creditor's] interest in the [collateral]." *Id.,* at 105. That court found the existence of a security interest under a UCC § 9–306 "proceeds" analysis; therefore, the *Alcom* court did not need to reach the issue of a secured party's possession of the collateral that was in the actual possession of the bailee warehouseman. *Id.,* at 105–106.

In an analysis of attachment in the context of this proceeding it is interesting to note that perfection occurs when a security interest "has attached and when all of the applicable steps required for perfection have been taken." TENN.CODE ANNOT. § 47–9–303(1) (1992). One of those perfection steps may be possession of the collateral by a bailee with notice of the secured party's interest. TENN.

CODE ANNOT. § 47–9–305 (1992). If the perfection steps, including such bailee possession, "are taken before the security interest attaches, it is perfected at the time when it attaches." TENN.CODE ANNOT. § 47–9–303(1) (1992). Thus, the Code's structure logically contradicts the Trustee's and BTCo's arguments against attachment in this proceeding. In comparison to attachment, "perfection of a security interest is intended as a method to give persons not a party to a financing transaction notice that a party to the transaction claims a security interest in some or all of the assets of the borrower." WEISE, at 708. This being true, it strains the Code's purposes for the Trustee and BTCo to insist that possession in a bailee such as L & S might be sufficient for perfection but could never be sufficient for attachment.[4] After all, the facts will reveal that BTCo was a party to the establishment of bailee possession in L & S and as a result BTCo obviously had notice of the creation of a security interest in favor of Rollins. The Trustee seizes the position of BTCo while carrying the banner of unsecured creditors; however, as noted previously, the largest unsecured creditor in this case that will largely benefit, under the confirmed plan, from any avoidance recovery by the Trustee is BTCo. More importantly, the Trustee may not avoid the transfers to Rollins if Rollins retained until payment an attached and perfected security interest.

▬ After its analysis of the UCC, authorities and cases, this Court concludes that, under appropriate facts, attachment of a security interest may be accomplished through a bailee's possession of the collateral, provided that the bailee is not controlled by the debtor and that the bailee has sufficient notice of the secured party's interest. The factual discussion will reveal a basis for finding creation of a bailment and attachment through the bailee's possession in this proceeding. Moreover, the facts reveal that the bailee's possession here provided adequate notice to third parties, including unsecured

---

4. The Trustee and BTCo also rely upon *Warsco v. Schaller Trucking Corporation (In re R & L Cartage & Sons, Inc.),* 118 B.R. 646, 650 (Bankr. N.D.Ind.1990) for the conclusion that UCC § 9– 203 requires "actual physical possession." That is not a bailment case and does not address any issues before this Court.

creditors, that a secured party may have an interest in the pledged warehouse receipts.

## PERFECTION OF A SECURITY INTEREST

In addition to attachment, in order for a secured party to obtain priority over third parties who may have or acquire a security interest in the same collateral, a secured party normally must perfect its security interest. TENN.CODE ANNOT. § 47–9–301 (1992). One method of perfection is the filing of a financing statement, but an exception is made for a "security interest in collateral in possession of the secured party." TENN. CODE ANNOT. § 47–9–302(1)(a) (1992). The UCC adopted a "notice filing" system. TENN.CODE ANNOT. § 47–9–402, comment 2 (1992). "What is required to be filed is . . . only a simple notice which may be filed before the security interest attaches or thereafter." Id. "The notice itself indicates merely that the secured party who has filed may have a security interest in the collateral described." Id. "Further inquiry from the parties concerned will be necessary to disclose the complete state of affairs." Id. Another method of perfecting a security interest is by possession, as provided in TENN. CODE ANNOT. § 47–9–305:

47–9–305. When possession by secured party perfects security interest without filing.—A security interest in letters of credit and advices of credit (subsection (2)(a) of § 47–5–116), goods, instruments (other than certificated securities), negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from

the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this chapter. The security interest may be otherwise perfected as provided in this chapter before or after the period of possession by the secured party.[5]

In comment 1 to TENN.CODE ANNOT. § 47–9–302(1), the section that lists exceptions to when filing is required to perfect, it is stated that the cases recognize that there are "suitable alternative systems for giving public notice of a security interest." TENN. CODE ANNOT. § 47–9–302 comment 1. Perfection may be by possession of the collateral by the secured party, his agent or a bailee. Id., comments 1 & 2; § 47–9–305; see also, e.g., IV CRANDELL § 25.12.2, at 25:72. If perfection is by a bailee's possession, the time of perfection is when the bailee "receives notification of the secured party's interest." TENN.CODE ANNOT. § 47–9–305 (1992).

The UCC's general provisions state that "a person has 'notice' of a fact when:"

(a) he has actual knowledge of it;

(b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists.

A person "knows" or has "knowledge" of a fact when he has actual knowledge of it.

TENN.CODE ANNOT. § 47–1–201(25) (1993 Supp.). Also, the UCC in another section states that possession of goods by a bailee, when the bailee has not issued a negotiable document for them, is perfected in one of three ways, including "the bailee's receipt of notification of the secured party's interest." TENN.CODE ANNOT. § 47–9–304(3) (1992).

---

5. It should be noted that the certificated warehouse receipts in this proceeding are not "certificated securities," which are defined under the UCC as

a share, participation, or other interest in property of or an enterprise of the issuer or an obligation of the issuer which is:

(i) represented by an instrument issued in bearer or registered form;

(ii) of a type commonly dealt in on securities exchanges or markets or commonly recognized in any area in which it is issued or dealt in as a medium for investment; and

(iii) either one of a class or series or by its terms divisible into a class or series of shares, participations, interests, or obligations.

U.C.C. § 8–102(1)(a) (1993).

As to the sufficiency of the notice to a bailee, "the secured party need not identify the specific character of its interest in the property to put the bailee on notice of its responsibilities to the secured party." WORLEY § 6A.04[2][e][i], at 6A–76; *see also Data General Corporation v. Still (In re Ault)*, 6 B.R. 58, 68 (Bankr.E.D.Tenn.1980). Rather, the sufficiency of the notice should be determined in the context of the facts and circumstances of each case. The ultimate question is: Did the particular notice "reasonably alert the bailee of its duties to the secured party with respect to the collateral?" WORLEY § 6A.04[2][e][i], at 6A–76. Notification in this context is best served by notification to the bailee by the debtor, because this reinforces the debtor's relinquishment of control over the collateral. *In re Kontaratos*, 10 B.R. at 970.[6] As discussed in the attachment portion of this opinion, creation of a possessory security interest and perfection may occur simultaneously upon proper notice to a bailee in possession, assuming the other requirements for attachment and perfection are present. 8 HAWKLAND § 9–203:04, at 652.

Upon unilateral notice of the secured party's interest from the debtor to the bailee, it is no longer "necessary for the bailee to attorn to the secured party or acknowledge that [the bailee] now holds on [the secured party's] behalf." TENN.CODE ANNOT. § 47–9–305, comment 2 (1992); *In re Housecraft Industries, USA, Inc.*, 155 B.R. 79, 92 (Bankr.D.Vt.1993).

As evidenced by the UCC, the purpose of perfection, and to some extent attachment, is notice to the world that someone other than the debtor may have an interest in the collateral. "Although the filed financing statement serves the primary notice function, the Code envisions that its inspection will be only the first step in discovering the debtor's affairs." 2 WHITE and SUMMERS § 24–3. Possession can serve this perfection notice function. If the possession is by someone other than the secured party, it needs to satisfy an objective standard; thus,

it should be "of the type that a reasonable person would understand that the possession of the collateral by someone other than the borrower may mean that a third person claims a security interest in the property." WEISE, at 712–713. Perfection by possession "exists when the secured party or another person has such possession of the collateral that a reasonable person should have reason to know that another person claims a security interest in the collateral." *Id.* Generally, owners are expected to have possession or control of their assets. 2 WHITE and SUMMERS § 24–12. If an owner does not have possession of assets, a potential secured creditor should ask why the owner is not in possession. *Id.*, at 933–34. "The creditor's possession (and the debtor's lack of it) is designed to put third parties on notice." *Id.* Some authority indicates that "actual possession is required because it is this which gives notice to the world that the debtor does not have full use of the collateral." 9 ANDERSON § 9–305:7, at 118–119. The possession "must be unequivocal, absolute, and notorious." *Id.*, at 119.

The cases that have construed the relevant sections of the UCC also conclude, in agreement with the authorities discussed previously, that the purpose of perfection is to give notice to the world that someone besides the debtor may have an interest in the collateral. In a Third Circuit case interpreting UCC § 9–305, the court stated that it believed "that possession by a third party bailee who is not controlled by the debtor, which adequately informs potential lenders of the possible existence of a perfected security interest satisfies the notice function underlying the 'bailee with notice' provision of § 9–305." *In re Copeland*, 531 F.2d at 1204.

Also, in a bankruptcy case from the Eastern District of Tennessee, that court pointed out that an important function of possession is to give notice that someone besides the owner has rights in the goods. *In re Ault*, 6 B.R. at 65. The *Ault* court further stated that "possession must be measured in part by its ability to give notice." *Id.*

---

6. *See* WEISE, at its note 29, stating that UCC does not mandate whether § 9–305 notice comes from the borrower or the secured party but observing

that UCC § 8–313(1)(h) requires notice of a transfer of a security interest to come from the borrower.

In addition, in a case involving perfection through possession by a bailee, one court stated that third parties would have "notice that the Debtor may not have the unfettered use of the collateral ... [and] that the Debtor's interest in the collateral may be encumbered and that further inquiry is warranted ..." *In re Atlantic Computer Systems, Inc.*, 135 B.R. at 470. That court warned that the " 'bailee with notice' method of perfection would be easier to accept if it was limited to situations in which the collateral was held by the secured party's bailee or an escrow agent." *Id.*, at 471. That is the situation in the present case: The facts reveal that L & S acted as a bailee for Rollins.

As observed previously, perfection by notice to a bailee of the secured party's interest in collateral is a separate factual and legal issue from the issue of existence of a bailee. WEISE, at 713–714. Also, the notice to the bailee must be distinguished from notice to third parties that the secured party claims a security interest in the collateral. WEISE, at 715. However, "[g]iving notice to the person in possession serves as a convenient temporal marker to determine when 'possession' begins and at least creates the possibility of a third party obtaining information [about the secured party's claim] from the person in possession." *Id.*

▮ As to perfection, the factual disputes in this proceeding are whether L & S functioned as a bailee for Rollins and whether L & S had notice of Rollins' interest in the uncertificated cotton warehouse receipts. After an analysis of the facts the Court has concluded that Rollins did hold a perfected security interest in those warehouse receipts and that adequate notice of that security interest was given to third parties through the bailee's possession.

### DISCUSSION OF FACTS

▮ Having reached certain conclusions of law, the Court will now discuss the facts and circumstances presented by the proof in this adversary proceeding. The Court's findings of fact are contained in the parties' stipulations and in this discussion. An appli-cation of the conclusions of law to these factual findings reveals that Rollins was, and remained, a fully secured creditor throughout the transactions, including at the time of payment. Therefore, the Trustee fails to satisfy 11 U.S.C. § 547(b)(5).

It is conceded that Rollins was initially a secured creditor, whose security interest arose by agreement with the debtor, attached to the certificated warehouse receipts as those receipts came into Rollins' possession, and was perfected by Rollins' possession of those certificated receipts. The financing agreement between Mr. Julien J. Hohenberg on behalf of the debtor, and Mr. Stuart H. Frazer on behalf of Rollins, was oral but was documented by the parties' actions and by subsequent writings. Exhibits 17, 18.

As stipulated, oral agreements between cotton merchants were common in the industry. *See also* Frazer deposition, pp. 55–56, 104. Had this transaction been limited to the agreement between the debtor and Rollins, as to the certificated cotton warehouse receipts, there would be no question that Rollins was an attached and perfected secured creditor under TENN. CODE ANNOT. § 47–9–203 and § 47–9–305.

The nature of the transactions between the debtor and Rollins became more complex as other parties became involved. In substance, the debtor originally had purchased certain certificated cotton from Rollins. The stipulations and depositions reveal that Rollins had acquired approximately 190,000 bales of certificated cotton in April and May, 1989, and had sold a substantial amount of this to the debtor, for which Rollins had been paid. Subsequently, the debtor, having sold the cotton, decided to repurchase from third parties some of this cotton, and the debtor requested that Rollins either repurchase, or finance the debtor's repurchase of, approximately 65,000 bales of the certificated cotton. Rollins agreed and took possession of the negotiable warehouse receipts for those 65,-000 bales as Rollins paid for them.[7] It should be noted, in order to avoid unneces-

---

7. *See* Mr. Frazer's description of Rollins's agreement to "carry the cotton" so as to permit the debtor to repurchase certificated cotton. Frazer deposition, pp. 117–120.

sary confusion, that at this point the certificated cotton warehouse receipts had not been in L & S's hands; rather, they came to Rollins as Rollins paid commission houses or brokers. *See* Frazer deposition, p. 117–139. By July, 1989, the parties had agreed that if the cotton could be sold at a profit before the first notice day in October, it would be sold.[8] Rollins, in that event, would have been paid in full, including its interest and carrying charges, and the profit, if any, would have been split between the parties. However, if the cotton was not sold to a third party, the debtor was obligated to pay Rollins for the cotton on or before the first notice day in October, in which event the transaction would be an extension of financing by Rollins, and Rollins would still be entitled to its interest and carrying costs. Rollins held the negotiable certificated cotton warehouse receipts either as an owner or as a secured creditor, depending upon the ultimate nature of this phase of the transaction. As it developed, the transaction was one for secured financing. Had the transaction stopped here, there is no dispute that Rollins would have been properly attached and perfected as a secured creditor.

After this agreement had been reached and consummated by Rollins' possession of the certificated cotton warehouse receipts, the debtor, for its own reasons, determined that it would have the cotton decertificated so as to eliminate overage penalties that were accruing.[9] This process required that the debtor obtain physical possession of the certificated cotton warehouse receipts from Rollins. The debtor needed the certificated receipts in order to obtain computer data and to accomplish its purpose of going through a "de-cert/re-cert process." Elzie deposition, p. 134; Frazer deposition, p. 139. Since the debtor was not paying Rollins at that point in time, the parties agreed that Rollins would be given substitute uncertificated cotton warehouse receipts in a sufficient number to continue to secure Rollins' debt. It was intended by the debtor and Rollins that Rollins was then giving up its original possessory collateral and receiving replacement collateral in uncertificated cotton warehouse receipts that were in the physical custody of L & S in Memphis. Had the debtor simply paid Rollins and obtained a release of the certificated cotton warehouse receipts, there would have been no depletion of the debtor's estate and no preferential transfer. Instead, the debtor asked Rollins to relinquish the certificated cotton warehouse receipts before being paid.

There was a request made of Rollins by Donna Elzie of the debtor for the release, and Ms. Elzie suggested the use of farmer's trust receipts as a means of continuing to secure the obligation to Rollins. Elzie deposition, pp. 60–62, 72, 119, 126–128. Rollins was concerned that it obtain sufficient exchange collateral to cover the release of the certificated receipts. Frazer deposition, p. 139. Thus, the debtor and Rollins negotiated the number of uncertificated cotton receipts necessary as substitute collateral. Elzie deposition, pp. 113–115; Frazer deposition, p. 139; Creswell deposition, pp. 23–25. Upon the relinquishment of the original certificated collateral, Rollins and the debtor intended that Rollins would contemporaneously receive trust receipts for a sufficient number of uncertificated cotton warehouse receipts so as to continue to secure Rollins' full debt. At this point, the two parties understood that the debtor owed Rollins a secured debt, payable at a specific future date, on or before the "first notice day" for October delivery of cotton on New York Futures contracts. Elzie deposition, p. 133. As between Rollins and the debtor, Rollins was still a fully secured creditor with a perfected security interest in the substitution collateral.

 However, the transaction was no longer restricted to the debtor and Rollins. This brings us to the interesting bailee issues in this proceeding. Analysis of the bailee issues and the facts in this proceeding involves the presence and actions of both L & S and BTCo. L & S was the subcustodian of the debtor's collateral, with L & S acting on behalf of BTCo, the debtor's primary lender. L & S was an agent for BTCo. Exhibits 1 and 2. L & S's facilities were contiguous to

---

8. For discussion of "first notice day," *see* Frazer deposition, pp. 159–162.

9. For description of certification process, *see* Elzie deposition, pp. 76–88.

the debtor's facilities, but L & S had a separate entrance. Ludwick deposition, pp. 25–26. Notwithstanding the Trustee's contrary argument, the facts do not support a finding that the debtor controlled L & S, although the debtor worked closely with L & S and paid for the services provided by L & S. *See, e.g.,* Elzie deposition, pp. 64–66. Rather, L & S was controlled by BTCo as evidenced by the written agreements between L & S and BTCo (Exhibits 1 & 2) and by the fact that Mr. William Wirt Ludwick of L & S relied upon BTCo's instructions as to the Rollins' transactions. No particular form is mandated by TENNESSEE CODE ANNOTATED § 47–9–305 for the creation of a bailment. The two letters from L & S to BTCo (Exhibits 3 & 5) coupled with the issuance of the two trust receipts (Exhibits 4 & 6) acknowledge the bailee role of L & S toward Rollins. The Court finds from all of the facts and circumstances that an actual bailment did exist. However, at the very least, a constructive bailment arose from the actions of the parties. The Court understands that a superficial examination of the facts suggests control by the debtor over L & S, but a complete factual analysis reveals less than control by the debtor. L & S was a bailee of the debtor's collateral, holding numerous negotiable warehouse receipts for cotton. *See* TENN.CODE ANNOT. § 47–1–201(15) (1993 Supp.) and § 47–7–104 (1992) (defining "document of title" and "negotiable and nonnegotiable warehouse receipt"). The evidence demonstrates that L & S on occasion released warehouse receipts to the debtor, which receipts were shown as being "in transit" on the books and reports of L & S while the debtor did what was necessary to transfer those warehouse receipts to ultimate buyers. In other words, there was a trust relationship between the debtor and L & S. L & S was accustomed to receiving requests from the debtor and acting thereon. If L & S questioned the debtor's request, as in the Rollins' scenario, L & S contacted BTCo for instructions. The relationship between the debtor, BTCo and L & S must be understood

in order to put the questioned transactions into a proper perspective.

Andrew Halle in 1989 was deputy head of the commodities department of BTCo and that department provided merchant banking services to commodity trading companies. Halle deposition, p. 21. The first BTCo banking relationship with The Julien Company was in 1986. *Id.* p. 28. BTCo became the collateral agent for the debtor in April, 1988. *Id.,* p. 29. From the summer of 1987 through the transaction at issue, Mr. Halle was responsible for or acted as senior manager of the debtor's account.[10] *Id.,* p. 38. Moreover, from May, 1988 through the dates of these transactions, BTCo held the debtor's operating accounts and was the lead lending bank for the debtor. Elzie deposition, p. 53.

L & S was formed around May, 1988, to handle collateral for The Julien Company and was a subcustodian in Memphis as to cotton collateral and with respect to BTCo's custodial agreement with the debtor. Halle deposition, p. 395; Ludwick deposition, pp. 12–14; Exhibit 1. There was a separate collateral custodial agreement between BTCo and L & S covering government-related documents such as Commodity Credit Corporation forms, known as CCC–813. Halle deposition, p. 41; Exhibit 2. L & S basically performed collateral accounting functions, including maintenance of a physical count ledger, broken down by warehouses, of the warehouse receipts delivered to L & S by the debtor or others. Ludwick deposition, pp. 14–18, 30–31.

The subcustodial agreements permitted L & S to transmit cotton documents, as needed, to permit trading of the cotton; to allow the debtor access to cotton documents; and to permit the debtor to withdraw cotton documents under described circumstances. Exhibit 1, ¶¶ 3–7. In the event of conflicts between "instructions or directions" given to L & S by the debtor and BTCo, "whether oral or in writing," the bank's instruction or direction would control L & S. Exhibit 1, ¶ 10. A daily collateral reporting form was attached to the subdepository agreement,

---

**10.** Interestingly, but having no dispositive effect, the defendant Rollins also borrowed funds from BTCo as Rollins repurchased the certificated cotton or advanced funds to the debtor. Frazer deposition, p. 128.

and these reports were sent daily to BTCo by L & S. Halle deposition, p. 53 and Exhibit 1. Mr. Halle "developed" this reporting form with the debtor and L & S. Halle deposition, p. 54. Mr. Ludwick testified that the only documentation of collateral that L & S maintained were its ledgers and the daily collateral report. Ludwick deposition, p. 31. On the reporting form were columns for reporting cotton documents in the vault, documents held by other collateral subcustodians and documents in transit. Halle deposition, pp. 53–56. There was a "CERT" column to report cotton in the process of certification by the government. *Id.*, pp. 56–58. There was also a trust receipts column for reporting withdrawal of cotton documents by the debtor on trust receipts for such purposes as data entry into the debtor's computer. Halle deposition, p. 58; Ludwick deposition, p. 36. Such an inhouse trust receipt was a tracking device, representing an understanding between L & S and the debtor that certain warehouse receipts were withdrawn by the debtor. Elzie deposition, pp. 59–60.

There was also a column to report a different type of trust receipt form, called a farmer's trust receipt, that was used approximately thirteen times by L & S. Halle deposition, p. 62; Ludwick deposition, p. 47. The use included the Rollins transactions. Halle deposition, p. 63. These trust receipt forms were modified from a Union Planters Bank form, and these were used to evidence that warehouse receipts were in the possession of L & S but were held or blocked for some purpose. Elzie deposition, pp. 60–61. It represented a commitment by L & S that a certain number of bales, stated in the farmer's trust receipt, were available. *Id.*, p. 128.

For purposes of this proceeding, it is immaterial whether farmer's trust receipts generally are negotiable, as the two at issue were captioned as nonnegotiable and were not in fact negotiated. These two trust receipts, Trial Exhibits 4 and 6, were completed and signed by L & S on the basis of information provided in conversations between Mr. Ludwick of L & S and Donna Elzie, of the debtor, after L & S received confirmation from Andrew Halle at BTCo. Ludwick deposition, p. 62–64; Elzie deposi-

tion, p. 147. A reading of the two trust receipts reveals that they were not completed with the correct parties' name on the correct lines; nevertheless, Mr. Ludwick of L & S acknowledged them to be typical of others signed by L & S. He found nothing unusual about the format of these two trust receipts. Ludwick deposition, p. 54.

The farmer's trust receipt dated August 15, 1989, provided as follows:

THIS IS TO CERTIFY that Rollins Cotton of _____ has delivered to the undersigned, for the account of THE JULIEN COMPANY in care of L & S COTTON SYSTEMS warehouse receipts and/or compress receipts and/or negotiable bills of lading calling for thirty-two thousand and two hundred (32,200) bales of cotton of various marks.

It is understood and agreed that the above documents are held in trust and that THE JULIEN COMPANY shall have the privilege of exchanging or substituting said collateral from time to time for warehouse receipts or other documents covering an equivalent number of bales of cotton, and shall be permitted to withdraw documents on their trust receipts for the purpose of making shipments.

It is further understood that the undersigned is acting only as custodian and assumes no responsibility for the genuineness or validity of the documents submitted or for the weight, grade, character, condition or value of cotton covered thereby.

This receipt is to be returned to the undersigned upon release of the above mentioned documents.

Exhibit 4.

The second farmer's trust receipt dated August 23, 1989, provided as follows:

THIS IS TO CERTIFY that ROLLINS COTTON COMPANY of _____ has delivered to the undersigned, for the account of THE JULIEN COMPANY in care of L & S COTTON SYSTEMS warehouse receipts and/or compress receipts xxxxxxxxxxxxxx THIRTY SIX THOUSAND FOUR HUNDRED FORTY (36,440) bales of cotton of various marks.

It is understood and agreed that the above documents are held in trust and that THE JULIEN COMPANY shall have the privilege of exchanging or substituting said collateral from time to time for warehouse receipts or other documents covering an equivalent number of bales of cotton, and shall be permitted to withdraw documents on their trust receipts for the purpose of making shipments.

It is further understood that the undersigned is acting only as custodian and assumes no responsibility for the genuineness or validity of the documents submitted, or for the weight, grade, character, condition or value of cotton covered thereby.

This receipt is to be returned to the undersigned upon release of the above mentioned documents.

Exhibit 6.

█ Mr. Halle and an independent expert agreed that the two farmer's trust receipts issued by L & S in reference to the Rollins' transactions were completed incorrectly. Halle deposition, p. 17; Exhibit 16. But the errors do not render the nonnegotiable trust receipts ineffective. Of more importance than the incorrect completion of the blanks is the knowledge and understanding that the parties had of their purpose. Ms. Elzie succinctly explained that the certificated cotton was being exchanged for trust receipts representing uncertificated cotton and that BTCo agreed to the dilution of its collateral pool by the number of uncertificated bales represented on the face of the two trust receipts. Elzie deposition, pp. 151–152. Of further importance is the action taken by BTCo and L & S to implement the trust receipts. Mr. Halle first heard of the idea of issuing these receipts in early August, 1989 in a telephone call from Donna Elzie. Halle deposition, p. 72. Donna Elzie advised him that Rollins had purchased certificated cotton on joint account with the debtor, that the debtor needed to have the certificated cotton warehouse receipts moved to Memphis for review by the debtor and for decertification/recertification. It was her suggestion to have a trust receipt issued to Rollins to cover the certificated documents. Mr. Halle agreed that this procedure was acceptable to the bank. Halle deposition, pp. 72–73. Mr. Halle testified that he later had a three way telephone call with Donna Elzie and "someone from Rollins to obtain some personal assurance that the warehouse receipts would be promptly remitted to L & S." Id., p. 73. There is some dispute about the substance of the call to or from Rollins. Mr. James Poole of Rollins testified that he called Mr. Halle after Ms. Elzie's call to him, and Mr. Halle advised that he (Halle) had been in touch with L & S to confirm that the trust receipts were being issued. Poole deposition, pp. 30–36.

Mr. Halle had a telephone conversation with Mr. Ludwick of L & S to approve the issuance of the first farmer's trust receipt by L & S to Rollins for 32,200 bales of cotton. Interestingly, Mr. Ludwick stated in this conversation that L & S would be receiving, from Rollins, the certificated cotton warehouse receipts the next day after issuance of the trust receipt. Halle deposition, p. 74. It is obvious that L & S knew that it did not have the certificated receipts in hand when it issued either of the farmer's trust receipts to Rollins. See Exhibits 4 & 6; Ludwick deposition, pp. 36–72, 104–105. In fact, it was L & S's knowledge that it did not have and would not be contemporaneously receiving the certificated cotton warehouse receipts that caused Mr. Ludwick to believe that these transactions were unusual. Ludwick deposition, pp. 51, 73. Mr. Ludwick knew from his initial conversations with Donna Elzie that L & S was not receiving the certificated receipts. Id., pp. 107–108. He testified that the use of a farmer's trust receipt indicated that L & S did not "actually receive the collateral;" rather, the debtor did. Ludwick deposition, p. 36. He stated that L & S had never issued farmer's trust receipts for warehouse receipts received by L & S on behalf of the debtor. Id., pp. 41–42. Thus, he sought and obtained prior approval from BTCo to "enter so many bales under certificated cotton and offset it with the farmer's trust receipt, [when] we didn't physically have the [certificated cotton] warehouse receipt." Id., pp. 50–51, 104–105. Mr. Ludwick communicated both in writing and verbally with Mr. Halle. Id., p. 69; Exhibits 3

& 5. He received both verbal and written authorization. Ludwick deposition, pp. 69–73. It is not plausible to infer that Mr. Ludwick would go through these steps to seek BTCo's approval of such an unusual transaction yet fail to discuss with Mr. Halle the fact that L & S was not receiving the certificated receipts.

Mr. Halle next had a conversation with Donna Elzie about the debtor obtaining the balance of Rollins' certificated receipts, and he determined that there was sufficient available bales of cotton in L & S's collateral pool over the amount "required to cover loans outstanding" to enable him to agree to the debtor's request. Halle deposition, pp. 75–76. Mr. Halle testified that it was his understanding that L & S would receive receipts for approximately 62,000 bales of certificated cotton in exchange for the two trust receipts issued to Rollins. *Id.*, at 78. Mr. Halle also testified that the certificated receipts should have come into L & S's office and then be sent out to the debtor by L & S, covered by an L & S transit letter, notwithstanding that the receipts would then need to be sent by the debtor to the appropriate government office for the decertification process that required two to six weeks. *Id.*, pp. 78–81.

Mr. Halle's post-bankruptcy recollection of the transaction is not significantly different from what the documents show. Not surprisingly, he and BTCo attempt to interpret the transactional facts in a way prejudicial to Rollins. The missing satisfactory explanation from Mr. Halle's testimony is why either trust receipt was signed by L & S when it was obvious that L & S did not have the certificated receipts. For example, before the issuance of the second trust receipt on August 23, 1989, L & S had not received the certificated receipts in exchange for the first farmer's trust receipt issued on August 15, 1989. Exhibits 4 & 6. If Mr. Halle really relied upon the actual delivery of the certificated receipts to L & S he would not have authorized the second trust receipt as he did. The knowledge that L & S did not have the certificated receipts undermines the Trustee's and BTCo's argument that it is Rollins' fault that the certificated receipts could not be tracked by L & S. L & S and BTCo encouraged any tracking problem by allowing the farmer's trust receipts to be issued without requiring the certificated receipts to be in L & S's hands. Moreover, it is obvious that L & S and BTCo knew that the debtor had received the certificated warehouse receipts. It is significant that Mr. Halle never asked why the certificated cotton was reflected on the daily collateral report as "in transit." Halle deposition, pp. 105–107. The simple answer to BTCo's concern over the tracking system breakdown is that both BTCo and L & S were or should have been aware that the debtor was receiving the certificated receipts, and L & S or BTCo could have required the debtor to deliver them to L & S for initiation of its tracking process.

This finding is underscored by a summary of these transactions, prepared by Mr. Halle around the time of the bankruptcy filing. There, he stated:

> In August Julien arranged for Rollins to deliver to Julien the certificated receipts for working and in exchange pledged back to Rollins pool cotton (approximately 62,400 bales/68,640 bales).

Exhibit 19.

The memorandum refers to a delivery to The Julien Company rather than to L & S. This memorandum also uses the word "pledged," and this reaffirms the possessory security interest intended to be created in the uncertificated receipts that were in the possession of L & S.

Mr. Halle authorized the issuance of the two trust receipts with the understanding that Rollins would have an interest in the uncertificated cotton warehouse receipts held by L & S and described in the trust receipts. Halle deposition, pp. 81–82. From the issuance of the two trust receipts until their return by Rollins in October, 1989, based upon the reporting from L & S to BTCo, there were sufficient bales in the collateral pool to cover the trust receipts and "the bank's requirements in terms of collateral." Halle deposition, pp. 87–88. Under normal circumstances, it would have been expected that had Rollins presented the trust receipts at L & S for exchange for the actual blocked warehouse receipts and if there was sufficient cotton in the collateral pool, BTCo

would have authorized the exchange. Halle deposition, pp. 82–83; Exhibit 16. During the time that the farmer's trust receipts were outstanding, the debtor in its normal course of business was withdrawing, exchanging, and substituting collateral in the pool at L & S. Halle deposition, pp. 90–91. In other words, nothing about the Rollins' transactions caused the debtor or L & S or BTCo to alter the manner in which they conducted business with each other.

As stated, Mr. Halle's approval was not only oral but in writing, with his approval noted on two letters from L & S requesting the same. Exhibits 3 & 5. Of course different meanings are attributed by the parties to his approval. His written approval of the August 15, 1989 trust receipt was:

> o.k. to proceed as an exchange of receipts, bale for bale basis. T/R for Rollins to be excluded from bank collateral. This should be a short term T/R and will be followed on this basis.

Exhibit 3.

This note was made on the faxed letter from L & S stating that upon approval, L & S would block warehouse receipts to cover the trust receipt and would physically segregate the necessary warehouse receipts from the debtor's inventory. Exhibit 3; Ludwick deposition, pp. 69–73. Mr. Ludwick interpreted Mr. Halle's memo to mean that a like amount of warehouse receipts would be blocked and this is what he did. Ludwick deposition, p. 108. Again on August 23, 1989, L & S faxed a letter to Mr. Halle requesting approval to increase the trust receipt by 36,440 bales, and Mr. Halle's written note read: "OK to release." Exhibit 5; Ludwick deposition, p. 73.

After signing the two trust receipts, Mr. Ludwick delivered them in duplicate to the debtor, and then on L & S's collateral reports he blocked or made an accounting segregation of the uncertificated cotton warehouse receipts referred to in the two trust receipts. Sufficient warehouse receipts were in L & S's vault at that time and remained so throughout the necessary period to satisfy the blocked warehouse receipts. Ludwick deposition, pp. 79–82.

It is immaterial why L & S originally had possession of the collateral. It is not L & S's subjective intent that is at issue. *See generally*, 9 ANDERSON § 9–305:7. Rather, of significance is the objective evidence of L & S's acknowledgement that it had blocked the appropriate number of uncertificated cotton warehouse receipts for Rollins' benefit. It was not until BTCo called L & S and instructed a removal of the block that this was done. Ludwick deposition, p. 82. This removal of the block was contemporaneous with the payment from the debtor to Rollins.

Mr. Halle was aware on the dates of payment that the debtor was paying Rollins and he confirmed the availability of funds to cover the payments. Halle deposition, p. 111; Exhibit 21. Ms. Elzie talked with Rollins, BTCo and L & S about Rollins' release of the two trust receipts after payment. Elzie deposition, pp. 135–138, 163–164; Halle deposition, pp. 111–112. The debtor had been running over its credit facility with BTCo since March 2, 1989; therefore, the debtor could not pay Rollins without BTCo's approval. Elzie deposition, pp. 161–163.

The Trustee and BTCo now argue that neither attachment nor perfection were accomplished in this transaction, but the totality of facts and circumstances and reasonable inferences drawn therefrom support a finding that both BTCo and L & S made the certificated receipts available to the debtor while Rollins' security interest attached to the blocked uncertificated receipts in L & S's collateral pool as represented by the two trust receipts. Interestingly, in contrast to its present argument that possessory attachment can never be accomplished except by the secured party's actual and exclusive possession, BTCo acknowledged that it, as a secured creditor, could have "a perfected and enforceable security interest" in collateral and proceeds that were in the possession of the creditor or an agent or bailee of the creditor, as well as in collateral made available to the debtor by the creditor or its

bailee or agent pursuant to a trust receipt or other security agreement. Exhibit 26. These and other similar acknowledgements are contained in an "Inter–Creditor Agreement" executed by BTCo on November 2, 1987. Exhibit 26. The use of the word "enforceable" in this document is significant, in that it refers to creation or attachment rather than perfection. *See* prior discussion on attachment.

Having determined that L & S was a bailee, questions remain as to whether L & S was the bailee for Rollins. The Trustee and BTCo dispute that L & S held the uncertificated cotton warehouse receipts subject to Rollins' security interest. The facts do establish that Rollins released the certificated warehouse receipts to the debtor rather than to L & S. However, the certificated receipts were reflected in L & S's records as being "in transit," and this was not only in compliance with the instruction from Donna Elzie of the debtor but in compliance with BTCo's confirmation of Mrs. Elzie's instructions. Ludwick deposition, pp. 109–112; Exhibits 8 & 9. Interestingly, the 62,400 certificated bales were carried on the daily reports from L & S to BTCo as in transit for the entire period August to October, 1989. Exhibits 8, 9, 10 & 11. Collateral report number 315 at page 704558 reflects 32,200 certificated bales. Exhibit 8; Ludwick deposition, p. 98. Collateral report number 322 reflects, at page 704175, 62,400 certificated bales. Exhibit 9; Ludwick deposition, pp. 99–100. The certificated cotton shown on Exhibits 8 and 9 were reflected as being "in transit." Ludwick deposition, pp. 109–112. Clearly, as stated earlier, BTCo was on notice that L & S did not have the actual receipts. Yet, Mr. Halle never questioned these reports. Halle deposition, p. 106. They were still reported as in transit after Rollins surrendered the farmer's trust receipts and was paid the $22 million. Exhibit 11. It is now convenient for the Trustee and BTCo to blame the loss of the certificated receipts on Rollins, but the facts do not justify such blame. Furthermore, it was the debtor that needed possession of the certificated cotton warehouse receipts in order to accomplish the decertification/recertification procedure.

■ Had the certificated cotton warehouse receipts been delivered to L & S, L & S would have been required to immediately deliver them to the debtor so as to permit the decertification/recertification. *See* Halle deposition, pp. 116–117; Exhibit 19. While L & S did not actually receive physical possession of the certificated warehouse receipts, it had de facto custodial control over those receipts as reflected in its records and by the course of dealing between L & S, the debtor and BTCo. Moreover, L & S acknowledged its custodial control of the certificated cotton warehouse receipts by its execution of the two farmer's trust receipt forms that stated that Rollins had delivered to L & S the warehouse receipts, by its blocking the uncertificated replacement collateral, and by its daily reports reflecting the certificated receipts as being "in transit." The subcustodian agreements and the trust receipt forms provided that the debtor could withdraw documents. Exhibits 1, 2, 4 & 6. The actual delivery of the certificated cotton warehouse receipts to the debtor instead of to L & S does not defeat the de facto control which L & S exercised over the debtor's collateral. There was a constructive delivery to L & S. Such a finding is supported by the fact that L & S's records reflected an entry of receipt of the certificated cotton contemporaneously with the offsetting farmer's trust receipts. Exhibits 8, 9, 10 & 11. L & S specifically obtained authority from BTCo to issue the two farmer's trust receipts, and both BTCo and L & S obviously knew that it had not actually received the certificated warehouse receipts for the 62,400 bales. Even though Mr. Halle stated that he assumed that L & S would actually receive the certificated warehouse receipts, BTCo is bound by the knowledge of its agent and subcustodian L & S that obviously knew that it was not receiving the certificated receipts. *See* Ludwick deposition at pp. 50–51, 98–100.

■ It should also be noted that the delivery by Rollins to the debtor of the certifi-

cated receipts is not fatal to Rollins' position. Rollins is not claiming a security interest in the certificated cotton. Rather, Rollins lost its security interest in its original certificated collateral upon surrender, but it gained new collateral in the form of the uncertificated cotton warehouse receipts in the possession of the bailee, L & S, who recognized and preserved Rollins' security interest by blocking the collateral.[11] The debtor did not thereafter exert control over the blocked collateral; rather, L & S and BTCo exercised control of that collateral.

■ The Trustee and BTCo also argue that L & S, if a bailee, did not have knowledge of Rollins' security interest, but as stated, knowledge of the exact nature of Rollins' interest is not required by the language of TENN.CODE ANNOT. § 47–9–305. Clearly, L & S had notice that Rollins was asserting an interest in the blocked warehouse receipts. L & S acknowledged that by its execution of the two trust receipts. L & S certainly knew, at that point, that Rollins claimed some interest in the uncertificated cotton warehouse receipts represented by the two farmer's trust receipts. There would be no other reason for the issuance of the two trust receipts nor for L & S's paper segregation or blocking of the uncertificated cotton warehouse receipts identified in the two trust receipts. Not only was L & S engaged in blocking the uncertificated cotton warehouse receipts so as to assure that the number was maintained while the trust receipts were outstanding, but BTCo was also aware of, authorized and directed L & S's actions in deducting the blocked receipts from BTCo's collateral pool. Furthermore, by the very nature of L & S's responsibilities under its written agreements with BTCo, L & S knew that it was holding collateral for secured lenders. *See* Exhibits 1 & 2. TENN.CODE ANNOT. § 47–9–305 only requires that the bailee know of the secured party's interest, and L

& S's actions in blocking the collateral on its records belie L & S's assertions.

L & S clearly had notice of Rollins' interest in the blocked warehouse receipts. Mr. Ludwick admitted that L & S was "aware that Rollins was involved," although he denied knowledge of the extent of Rollins' interest. Ludwick deposition, pp. 84–85. It is sufficient notice to L & S as a bailee that L & S knew Rollins had an interest in the warehouse receipts. L & S was aware, as admitted by Mr. Ludwick, and its collateral reports reflected that the bales were set aside or blocked with a specific reference to "Rollins trust receipt." *Id.*, p. 95. Moreover, L & S knew that it must maintain that block to cover the trust receipts until further notice from BTCo. *Id.*, p. 86; Exhibits 17, p. 704558 and 18, pp. 704175, 704230. As Mr. Ludwick succinctly put it, blocked meant "just set aside, not to be monkeyed with." Ludwick deposition, p. 101.

■ The Trustee and BTCo argue that L & S failed to physically segregate Rollins' collateral as L & S stated it had done in the trust receipts. However, this is form over substance. The facts are undisputed that the records of L & S consistently reflected a blocking of the required number of uncertificated cotton warehouse receipts from the time of issuance of the two farmer's trust receipts until October 30, 1989, a date after Rollins had been paid by the debtor and after Rollins had released the two trust receipts. Exhibit 8, 9, 10 & 11; Ludwick deposition, pp. 86, 95–101. L & S told BTCo that it would physically segregate the Rollins collateral. Exhibit 3. A paper segregation rather than physical segregation was carried out. All of this paper segregation on the books of L & S was done with the full knowledge and consent of both the debtor and BTCo. The effect of L & S's activity was to segregate warehouse receipts for 68,640 bales of uncertificated cotton to secure Rollins' trust receipts. L & S maintained that number of

11. If any party permanently lost a perfected security interest it may be BTCo or other lenders if they knowingly allowed the debtor to obtain and dispose of the collateral cotton. It would also appear from the facts before the Court that BTCo knowingly subordinated its secured position in

the blocked uncertificated cotton warehouse receipts to the temporary first lien position of Rollins. As previously noted, this does not seem to leave room for a future priority dispute between BTCo and Rollins.

bales in a blocked fashion so as to keep that number of bales from being depleted. The logical inference is that L & S issued the two trust receipts for the purpose of indicating a blocking of uncertificated cotton warehouse receipts for the benefit of Rollins, and L & S's total actions support such a finding.

Moreover, the issuance of the two trust receipts was reflected as a deduction on L & S's daily report. Ludwick deposition, pp. 87–88; Exhibit 11, p. 703927. And, L & S's collateral report number 315 reflects that on August 16, 1989, a deduction was made in the collateral consistent with the August 15, 1989 farmer's trust receipt. Ludwick deposition, pp. 92–93; Exhibit 8, p. 704558. The same is true as to collateral report number 322 as it relates to the two farmer's trust receipts as of August 25, 1989. Ludwick deposition, pp. 93–94; Exhibit 9, p. 704175. Trial Exhibit 9 at page 704175 shows the 68,640 bales blocked on account of the Rollins' trust receipts. Ludwick deposition, pp. 94–95.

Collateral report number 366 dated October 27, 1989, at page 703948 reflects the 68,640 bales still blocked. Exhibit 10; Ludwick deposition, pp. 95–96. Collateral report number 367 dated October 30, 1989, on page 703927 reflects that the 68,640 bales were now unblocked, a time that came after the debtor had paid Rollins in full. Exhibit 11; Ludwick deposition, p. 96. The removal of the block effectively increased the collateral pool by 68,640 uncertificated bales. Halle deposition, p. 108.

As stipulated, the daily collateral reports were all maintained in the ordinary course of L & S's business. Stipulation number 68.

As discussed under the conclusions of law, perfection of security interests by possession of a bailee is intended to provide notice to "prospective creditors that the [debtor's] ownership rights may be restricted or encumbered." *In re Crabtree*, 48 B.R. at 532. Clearly, L & S notified BTCo that the blocked receipts were subject to Rollins' interest, and L & S admitted that the blocked

number of receipts must be maintained in order to cover the two trust receipts held by Rollins. Ludwick deposition, pp. 79–81, 84–86, 95, 101. There is nothing to indicate that L & S would not have similarly notified any other inquiring party, including unsecured creditors, of the blocked collateral.

There has been no proof offered that the debtor's collateral account at L & S suffered from this transaction nor has there been any proof offered that the debtor's estate was diminished by the Rollins' transaction.[12] The debtor received the warehouse receipts for the certificated cotton warehouse receipts for which Rollins received the agreed upon substitution collateral. Rollins released its security interest in the substituted collateral, the uncertificated cotton warehouse receipts, contemporaneously with payment. The debtor's estate made a significant payment to Rollins but received in return consideration for which it had bargained. As to the substitution collateral, the value of the uncertificated cotton is not disputed. The Trustee agreed that this cotton was worth as much as or more than Rollins' debt at all relevant times. *See* Transcript of December 2, 1993, pre-trial hearing, p. 48. Therefore, Rollins was a fully secured creditor throughout these financing transactions, including on the date of payment. The two wire transfer payments to Rollins merely satisfied Rollins' secured debt in full and Rollins received no more than it would have received had its lien been satisfied in a chapter 7 liquidation.

The Trustee's and BTCo's arguments are not consistent with the facts of what was intended and did occur in 1989. Moreover, after evaluating the facts in the light of the UCC, the Court concludes that the policy and function of the UCC is served by upholding Rollins' secured position. The parties to the transaction understood at the time that Rollins would have a security interest in the blocked uncertificated cotton warehouse receipts held by L & S, and all of the parties' actions support that finding. Moreover, the commercial world was placed on notice of

12. There have been statements of counsel that the certificated cotton was not recovered by the Trustee or by BTCo, but that is not supported by proof nor is that the focus of this proceeding.

Rollins' possessory security interest by the fact that the warehouse receipts were held and blocked by L & S, a bailee. BTCo now attempts to put the transactions in a different light than the one in which BTCo participated in producing at the time of the transactions. As to the Trustee's claims, there simply was no preferential effect as a result of these transactions. When Rollins surrendered the certificated cotton warehouse receipts, the debtor's estate was increased by their value. The debtor's estate was not adversely affected by L & S's blocking of the uncertificated cotton warehouse receipts because the estate owed Rollins a secured debt comparable to the value of the blocked receipts. And, with the payment to Rollins the debtor received a contemporaneous release of the collateral. Therefore, the net effect of the entire Rollins' transaction was of no detriment to the debtor or this bankruptcy estate.

Because the court finds that Rollins was an attached and perfected secured creditor in the uncertificated cotton warehouse receipts, which were in the possession of L & S, as a bailee for Rollins, it is unnecessary to discuss Rollins' alternative arguments as to proceeds.

### CONCLUSION

Based upon the conclusions of law and findings of fact, the Trustee has failed to prove 11 U.S.C. § 547(b)(5). Therefore, an Order and Judgment will be entered in favor of the defendant Rollins Cotton Company and against the Chapter 11 Trustee.